CITY OF NEW RICHMOND, a municipality,
Petitioner,

Tom DOAR, Gerald Klasen, James H. Buell, John
Johnston, James Tilly and Marilyn Lee,
Petitioners-Respondents-Cross-Appellants,†

v.

State of WISCONSIN DEPT. OF NATURAL
RESOURCES, Respondent,

AMERICAN RESOURCE RECOVERY, Intervenor-
Respondent-Appellant-Cross-Respondent. [Case
No. 88–0407.]

CITY OF NEW RICHMOND, a municipality,
Petitioner,

Tom DOAR, Gerald Klasen, James H. Buell, John
Johnston, James Tilly and Marilyn Lee,
Petitioners-Respondents,†

v.

State of WISCONSIN DEPT. OF NATURAL
RESOURCES, Respondent,

† Petition to review denied.

AMERICAN RESOURCE RECOVERY, Intervenor-
Respondent-Appellant. [Case No. 88-0408.]

Court of Appeals

*Nos. 88-0407, 88-0408. Orally argued May 12, 1988.—Decided
June 21, 1988.*

(Also reported in 428 N.W.2d 279.)

For intervenor-respondent-appellant, American Resource Recovery, there were briefs by *Charles Kamps, Arthur A. Vogel, Jr.* and *Nancy K. Peterson* and oral argument by *Charles Kamps* of *Quarles & Brady,* Milwaukee.

For petitioners-respondents-cross-appellants, Tom Doar, Gerald Klasen, James H. Buell, John Johnston,

James Tilly and Marilyn Lee, there were briefs by *William S. Roush, Jr., Charles D. Clausen* and *Laura E. Campbell* and oral argument by *William S. Roush, Jr.* of *Friebert, Finerty & St. John, S.C.,* Milwaukee.

For respondent, State of Wisconsin Department of Natural Resources, there were briefs by *Donald J. Hanaway,* attorney general and *Carl A. Sinderbrand,* assistant attorney general and oral argument by *Carl A. Sinderbrand* of the *Wisconsin Department of Justice,* Madison.

Before Cane, P.J., LaRocque and Myse, JJ.

MYSE, J. The American Resource Recovery (ARR) appeals the circuit court's decisions and orders concerning two petitions[1] filed under ch. 227, Stats., challenging various decisions of the Department of Natural Resources (DNR). Essentially, those decisions and orders rescinded an air pollution control permit issued by the DNR.[2] The circuit court ruled that because the DNR's environmental assessment (assessment) was inadequate,[3] the DNR had failed to comply with the Wisconsin Environmental Policy Act

---

[1]The two petitions, which are nearly identical and involve the same parties, were filed by the City of New Richmond and six citizens. The City of New Richmond is no longer a party to either case.

[2]Although their interests are significantly different, the ARR and DNR have taken similar positions on the legal issues regarding the validity of the DNR's decision not to prepare an environmental impact statement (EIS) and the validity of the air pollution control permit.

[3]The court initially ordered the DNR to prepare an EIS. However, at a later hearing, the circuit court granted the DNR's motion to remand the matter to the department for preparation of a revised or supplemental environmental assessment, rather than preparation of an EIS.

(WEPA), sec. 1.11, Stats., and that therefore the air pollution control permit must be rescinded as a matter of law. This court now concludes that the assessment was adequate and that the DNR's decision not to prepare an EIS was reasonable.

To better understand this case, a preliminary background discussion is necessary. The ARR, under contract with St. Croix County, applied to the DNR for an air pollution control permit and a solid waste facility license. The license and permit would allow the ARR to construct, and St. Croix County to operate, a municipal solid waste incinerator. The combustion process involved in incinerating municipal waste converts the solid waste into two other forms: (1) particulates which are emitted into the air, and (2) ash which must be disposed of in a landfill. In its application, the ARR submitted a feasibility report and identified the landfill that would be used to dispose of the ash generated by the incinerator. Additional cost-related information was later submitted.

Wisconsin does not have a single, comprehensive regulatory program for municipal incinerators. Because incineration is by definition "solid waste treatment," sec. 144.43(7r), Stats., an incinerator is subject to the regulatory controls and licensing requirements applicable to a "solid waste facility." Section 144.43(5), Stats. The air emissions from the incinerator's combustion process constitute "emissions from a stationary source" within the meaning of sec. 144.30(10) and (23), Stats., and are therefore subject to air pollution control permit requirements under sec. 144.391, Stats. Finally, the ash from the combustion process is solid waste under sec. 144.01(15), Stats., and can only be disposed at a facility licensed under sec. 144.44(4), Stats. Therefore, under the DNR's program, the

construction and operation of an incinerator require both a solid waste facility license and an air pollution control permit, and any ash generated at the facility must be disposed at a licensed solid waste disposal site.

After receiving the ARR's license and permit applications, the DNR issued its "Preconstruction Review," which evaluated the projected emissions from the facility, identified applicable emission limitations, and stated its preliminary determination that the air permit application was approvable. Later, public notice and a request for comments were published in the New Richmond newspaper and sent to the mayor of New Richmond, the United States Environmental Protection Agency, and others.

In addition to this public notice, the DNR issued a draft assessment, which discussed both the solid waste license and air pollution permit applications and concluded that an EIS was not required. It solicited comments on the proposed assessment during a fifteen-day comment period. The DNR received more than a dozen comments both in support of and in opposition to the proposed incinerator. The DNR also held a public hearing in New Richmond.

The final assessment, including the decision not to prepare an EIS, was prepared before the hearing and later amended. Thereafter, the DNR approved the feasibility report and operating plan for the solid waste facility and issued the license as well as the air pollution control permit. A request for a contested case hearing on the solid waste facility approval was denied on July 22, 1987. A request for a contested case hearing on the air permit was granted on July 22, 1987.

The petitions for judicial review of the cases on appeal were filed on June 12, 1987. In Case No.

87–CV–320, the petitioners sought review of the DNR's assessment and its decision that an EIS was not required before the permits were issued.

The trial court ruled that the DNR had not adequately investigated the incinerator's impact in its assessment. The court therefore ordered the department to prepare an EIS. The DNR moved for partial reconsideration, specifically focusing on the order to prepare an EIS. The DNR asserted that the appropriate remedy was remand for a determination of the need for an EIS based on an adequate assessment. The court agreed and so modified its decision and order.

In Case No. 87–CV–323, the petitioners sought judicial review of the DNR's issuance of the air pollution control permit for the incinerator. The court granted the petitioners' motion to vacate the ARR's air control permit because the issuance of the permit required compliance with WEPA. The court held that its finding that the assessment was inadequate constituted noncompliance with WEPA; therefore, the air control permit was void as a matter of law.

■

On appeal, the ARR contends that the circuit court erred by determining that the DNR's assessment was inadequate and by ordering the air pollution control permit vacated. The petitioners cross-appeal, challenging the trial court's amended order requiring the preparation of a new assessment instead of an EIS. The issue now is whether the DNR complied with WEPA, sec. 1.11, by preparing an adequate record and, if so, whether its decision not to order an EIS was reasonable. We conclude that under the test articulated in *WED v. PSC,* 79 Wis. 2d 409, 256 N.W.2d 149 (1977) (*WED III*), the record prepared by the DNR is adequate and that its decision not to prepare an EIS

was reasonable. Accordingly, we reverse the circuit court's decisions and orders and remand with directions to dismiss the two petitions. Because we reach this conclusion, we need not address the ARR's other contentions.

The Wisconsin legislature has attempted to protect our environment by creating the Wisconsin Environmental Policy Act, sec. 1.11, Stats. (1971). The purpose of WEPA is to insure that agencies consider environmental impact during decision-making. *See WED III,* 79 Wis. 2d at 416, 256 N.W.2d at 153. WEPA, which is procedural in nature, does not control agency decision making. It simply "require[s] that agencies consider and evaluate the environmental consequences of alternatives available to them in the exercise of that discretion, and to require that they undertake that consideration in the framework sec. 1.11 provides." *Id.*

WEPA requires that all state agencies prepare an EIS for "every recommendation or report on proposals for legislation and other major actions significantly affecting the quality of the human environment." Section 1.11(2)(c), Stats. This initially leaves the decision with the agency as to whether an EIS is required under a particular set of facts. *WED III,* 79 Wis. 2d at 419–20, 256 N.W.2d at 155. However, the agency must be able to produce a reviewable record that demonstrates "that its decision was reached upon a sufficient preliminary factual inquiry premised upon a proper construction of the obligations WEPA imposes." *Id.* at 418, 256 N.W.2d at 154–55.

Whenever an agency determines that an EIS is unnecessary, the reviewing court must inquire whether this determination "was reasonable under the circumstances." *Id.* at 421, 256 N.W.2d at 156. The

reasonableness standard has been expressed as a two-part test:

> First, has the agency developed a reviewable record reflecting a preliminary factual investigation covering the relevant areas of environmental concern in sufficient depth to permit a reasonably informed preliminary judgment of the environmental consequences of the action proposed;
>
> [s]econd, giving due regard to the agency's expertise where it appears actually to have been applied, does the agency's determination that the action is not a major action significantly affecting the quality of the human environment follow from the result of the agency's investigation in a manner consistent with the exercise of reasonable judgment by an agency committed to compliance with WEPA's obligations?

*Id.* at 425, 256 N.W.2d at 158.

■

The trial court applied the first part of the *WED III* test and concluded that the DNR had not performed the necessary investigation, resulting in an inadequate assessment. We owe no deference to the trial court when reviewing a DNR decision. *Kimberly-Clark Corp. v. LIRC,* 138 Wis. 2d 58, 63, 405 N.W.2d 684, 687 (Ct. App. 1987). Therefore, we review the record independently to determine whether the DNR has adequately developed a reviewable record reflecting a sufficient preliminary investigation of relevant areas of environmental concern. The test for this is whether the DNR has identified the environmental issues and the expected impact of the proposed action and considered available alternatives in a manner that provides a basis upon which a reasonable deter-

mination can be made as to whether an EIS is required. *WED III,* 79 Wis. 2d at 424–25, 256 N.W.2d at 158. We conclude that the administrative record reflects a sufficient preliminary investigation of the relevant areas of environmental concern to permit a reasonably informed preliminary judgment as to the environmental consequences of the incinerator.

The administrative record in this case includes an assessment compiled by the DNR. The assessment should identify the proposed action's effect on the environment, consider alternatives, and provide evidence as to whether the proposed action is a major action requiring the preparation of an EIS. Wis. Admin. Code sec. NR 150.02(9) (1987).

Here the eighty-page assessment includes numerous reference documents, provides an analysis of the proposed project, and reflects the DNR's consideration of public comments. Paraphrased, it contains in part:

1. A general description of the incinerator facility, its operation, and the disposal of the ash.

2. A description of the purpose and need for the incinerator.

3. A description of the proposed physical changes to the environment due to the incinerator's construction.

4. An analysis of emissions and discharges, including air emissions, ash disposal, sanitary sewage, and diversion of runoff water.

5. Evaluation of the existing physical resources, the biological environment, social/economic aspects, and special resources.

6. An analysis of the environmental impact of the facility on the physical and biological environ-

ment, including: analysis of the inhalation and deposition impacts of air emissions; proposed control measures and emissions testing requirements; discussion of traffic, noise, litter, dust, and odors as well as how the facility will minimize each; a description of the potential toxicity of the fly ash and alternatives for disposal; and a discussion of waste water generated at the facility.

7. A projection of the socio-economic impact that the facility will have on the area's work force.

8. A list of probable adverse impacts that cannot be avoided, including the loss of cropland, air quality, and the conclusion that the air quality is not expected to have an adverse effect on human health or local environment because the incinerator will utilize emission control systems that will reduce air emissions so no national air quality standards will be exceeded.

9. The identification, description, and discussion of feasible alternatives to the incinerator including no action, enlarging or reducing the project, modifying the project, utilizing other solid waste management techniques and relocating the project.

10. An evaluation of secondary and new environmental effects including the reduction of landfill waste, which would in turn eliminate the need for establishing new landfills, reduce the potential for groundwater contamination, and contribute to the improvement of air quality through elimination of open burning dumps.

11. An evaluation of public concerns, consistency with local zoning requirements, and cumulative impacts.

12. A list of agencies and individuals contacted regarding the facility.

13. A collection of maps and diagrams of the facility and surrounding area.

An amendment to the assessment, also prepared by the DNR, contained a memorandum that further examined the impact of the discharge of air pollutants and reviewed alternative air pollution control technology that could be used to minimize that discharge. The DNR concluded that the noninhalation routes of exposure are significant. Because this created a higher cancer risk than had been predicted for exposure through inhalation alone, the DNR recommended the installation and use of a dry scrubber-fabric filter baghouse control system. As a result, the use of this device, which would significantly reduce the negative impact of the emissions, was then made a condition of the permit.

The 1,000–page administrative record also includes a memorandum, dated May 14, 1987, which responded to public comments and was signed by directors of the DNR bureau of air and solid waste management. It addressed various concerns and comments expressed during a public hearing held in New Richmond on April 20, 1987. Specifically it addressed alternatives, the location of the incinerator, combustion and control equipment, ash disposal, air quality, inhalation risks, bioaccumulation and food chain cancer risk, testing, monitoring, and DNR inspection.

The extent of the DNR's investigation here is in sharp contrast to the actions of the PSC found to be inadequate in *WED III.* There, the PSC applied a presumption that impact statements were not necessary in rate increase proceedings, refusing to make even a minimal attempt to predict the environmental consequences of its actions. *Id.* at 425–26, 433–34, 256

546

N.W.2d at 158, 162. Under these circumstances, the supreme court characterized the PSC's decision not to prepare an EIS as merely "bald conclusion[s], unaided by preliminary investigation." *Id.* at 433, 256 N.W.2d at 161–62 (quoting *Maryland-National Capital Park & Planning Comm'n v. United States Postal Serv.*, 487 F.2d 1029, 1040 (D.C. Cir. 1973)). "No findings of fact were made, and insofar as it appears on the record, no significant factual investigation had been undertaken by the Commission." *WED III* at 426, 256 N.W.2d at 158. In addition, the court noted that the PSC had no WEPA regulations to guide it when "establishing screening procedures and categorizing its repetitive activities for purposes of determining the need for environmental impact statements." *Id.* at 436, 256 N.W.2d at 163.

In the present case, the administrative record assembled by the DNR far exceeded that which was envisioned by the *WED III* court. In fact, *WED III* cites with approval a case in which a five-page memorandum written by the deputy comptroller of the currency constituted an adequate record to support a decision not to prepare an EIS. *Id.* at 431, 256 N.W.2d at 160–61 (citing *First Nat'l Bk. of Homestead v. Watson*, 363 F. Supp. 466 (D.C. Cir. 1973)). The *Watson* court, in turn, cited a case in which a single-page memorandum was sufficient. *Id.* at 474. While we do not suggest that the length or weight of the record is determinative, we deem the administrative record in this case to be more than adequate insofar as it contains an in-depth consideration of the environmental issues and effects associated with the construction and operation of an incinerator as well as available alternatives.

Because we conclude that the DNR has satisfied the first step articulated in *WED III,* we next address the DNR's determination that construction and operation of the incinerator is not a major action significantly affecting the environment. The question we must consider is whether this determination follows from the results of the DNR's investigation in a manner consistent with the exercise of reasonable judgment. While we use a deferential standard of review, the DNR must make a reasonable decision based on the record. *WED v. DNR,* 115 Wis. 2d 381, 404, 340 N.W.2d 722, 733–34 (1983). We conclude that it has done so in this case.

In determining the reasonableness of the DNR's decision that an EIS is not required, we defer to the technical expertise of the department. *City of La Crosse v. DNR,* 120 Wis. 2d 168, 179, 353 N.W.2d 68, 73 (Ct. App. 1984). This is particularly appropriate here because the DNR is the state agency possessing staff, resources, and expertise in environmental matters. *DNR,* 115 Wis. 2d at 391, 340 N.W.2d at 727. Courts are ill-equipped, for example, to determine whether a given level of dioxin introduced into the food chain represents a significant environmental issue. It is possible that any change in our environment may be viewed as a "major action" by the public. Nonetheless, the language in WEPA sec. 1.11 maintains a distinction between major actions requiring an EIS and non-major matters that do not. We must rely on the department for its expertise in making such technical scientific determinations as long as it acts reasonably based on an adequately developed record.

The DNR regulations promulgated under WEPA define "major action" as "an action of such magnitude and complexity that the action will have significant

effects upon the quality of the human environment. It does not include actions whose significance is based only on economic or social effects." Wis. Admin. Code sec. NR 150.02(16) (1987). "Significant effects" are defined "as considerable and important impacts of major state actions on the quality of the human environment." *Id.* at sec. NR 150.02(25).

In its assessment, the DNR considered the incinerator's adverse environmental effects, reviewed alternatives, and evaluated the need for an EIS. After analyzing the anticipated effects of the incinerator on the environment, it determined that the construction of the incinerator was "not a major action that would significantly affect the quality of the human environment." It should be noted here that the DNR continues to monitor emissions even after the issuance of a permit.

Later, as a result of public comments raised at a hearing, the DNR, in an amendment to the assessment, examined bioaccumulation of dioxin in the food chain after deposition in the ground or surface water. It concluded that noninhalation exposure was significant but that the use of a dry scrubber-fabric filter baghouse air pollution control device would minimize the impacts of deposition. As mentioned above, the use of this device was made a condition of the permit.

Evidence that the DNR considered and evaluated the public comments is also found in the memorandum dated May 14, 1987, where the need for the preparation of an EIS was again considered and rejected:

> The environmental assessment prepared for the project summarizes the environmental impacts expected from this project, and various project

alternatives. The assessment concluded that the project is not a major action which would significantly affect the quality of the human environment. The size of the proposed resource recovery facility is relatively small. The predicted air quality impacts are also quite small. Extensive testing will be required to verify the air quality analysis. The ash produced by this facility will be tested and properly disposed, either in a well-engineered sanitary landfill if non-hazardous, or outside the state if hazardous. Continued testing, monitoring and inspections will be conducted to insure that the facility is properly operated in the future and that it will not have adverse impacts on the surrounding environment. For these reasons, it was concluded that an EIS is not required.

These documents demonstrate that the DNR applied its expertise throughout its consideration of the need for an EIS. It cited particular data found in the administrative record as the basis for its decision not to prepare an EIS. Finally, any potentially adverse environmental consequences were adequately considered and controlled through the permit conditions.

The petitioners argue that the record contains evidence revealing that the incinerator poses a significant threat to human health and the environment. They cite the addendum prepared by the DNR which concluded that under the conditions set forth in the "Preconstruction Review," the incinerator might create an excess human cancer risk as high as one in 1,086. In that addendum, the DNR postulated that the cancer risk due to all carcinogens and metals discharged by the incinerator might be nine times greater or approximately one in 121.

The petitioners also cite a study in which the authors calculated that a proposed refuse derived fuel facility would create an excess cancer risk of one in 12,658. *See* Stevens and Gerbec, *Dioxin in the Food Chain: A Model for Calculating Health Risk from RDF Incinerators,* Univ. of Minn. (March 25, 1987). In addition, the petitioners rely on *Municipal Waste Combustion Study,* "Assessment of Health Risks Associated with Municipal Waste Combustion Emission," EPA/530–SW–87–02 (September, 1987), an EPA qualitative analysis of the human health risks associated with municipal waste combustion. In this report, the EPA model analyzed the human health and environmental effects resulting from bioaccumulation and indirect human exposure to incinerator emissions. The EPA found that there was a possible human health effect for dioxin and chlorobenzene emissions due to food ingestion and a possible human health effect for dioxin, chlorobenzene and polychlorinated benzene emissions due to fish ingestion.

Finally, the petitioners argue that the DNR failed to consider alternative locations for the incinerator, alternative combustion equipment which might reduce carcinogenic emissions, and the potential harm to farm animals and dairy products from the bioaccumulation of dioxin, furans, mercury, and other organic compounds.

We are not persuaded by these arguments. None of these arguments is sufficient for us to hold that the DNR acted unreasonably in finding that the proposed incinerator did not constitute a "major action significantly affecting the quality of the human environment."

First, the DNR addendum relied on a model and variables based upon certain assumptions the validity of which had never been tested. Furthermore, the DNR specifically concluded that the addition of the bag scrubber device to the incinerator reduced any potential risk created by the proposed incinerator.

Nor is petitioners' reliance on the calculations in the bioaccumulation model as described in the Stevens and Gerbec article persuasive. In that study, the authors considered a different facility in a different setting with an emissions concentration of more than three times the ARR permit limit. Moreover, the model is replete with numerous assumptions regarding the behavior of dioxin emissions, absorption rates in different crops and conditions of the affected natural environment, which do not apply to the instant case and minimize its usefulness here.

Finally, the EPA study actually refutes the petitioners' conclusions. The generic study made no effort to quantify the potential risk and the study concluded that given the preliminary nature of the methodology and assumptions, the "EPA *cannot* interpret the results of the indirect exposure analysis quantitatively at this time." *Id.* at 2–17. The only conclusion that the EPA reached was "that indirect exposure to long-term deposited emissions *may* be comparable to direct inhalation exposure ...." *Id.* at 2–21 (emphasis added).

The complexities of such assertions and the validity of their scientific underpinning are eloquent testimony of the need to defer to the DNR's expertise in reviewing its conclusions in terms of their reasonableness. The assessment has identified the environmental issues related to the proposed incinerator project and the DNR has considered their effects and

reasonable alternatives. Nothing more is required of the DNR. Wis. Admin. Code sec. NR 150.22(2)e (1987).

Given the content of the record and relevant statutory language, we cannot say that the DNR acted unreasonably in determining that the incinerator project did not require an EIS. Therefore, the DNR's issuance of an air pollution control permit on the basis of the assessment was valid. In so holding, we need not reach the issues concerning whether the trial court properly invalidated the permit as a matter of law and remanded the case to the DNR.

*By the Court.*—Orders reversed and cause remanded.