Robert W. LARSEN, Plaintiff-Appellant,

v.

MUNZ CORPORATION, and the State of Wisconsin
Department of Administration, and its Secretary,
James R. Klauser, Defendants-Respondents.†

Court of Appeals

*No. 91-2811. Argued December 23, 1991.—Decided January 8,
1992.*

(Also reported in 480 N.W.2d 800.)

† Petition to review granted.

751

For the plaintiff-appellant the cause was submitted on the briefs of *Robert W. Larsen* of Monona. Oral argument by *Robert W. Larsen.*

For the defendants-respondents the cause was submitted on the briefs of *David J. Harth* and *Douglas B. Clark* of *Foley & Lardner* of Madison. Oral argument by *David J. Harth.*

Before Eich, C.J., Gartzke, P.J., and Sundby, J.

GARTZKE, P.J.  Robert W. Larsen appeals from an order dismissing his action against Munz Corporation and the Department of Administration (department) and its secretary James R. Klauser. Larsen sought a declaration that the department is required to file an

753

environmental impact statement under sec. 1.11, Stats., the Wisconsin Environmental Policy Act (WEPA), before constructing the proposed state administration building at 101 East Wilson Street in the City of Madison.[1]

We conclude that the department failed to follow its own rules governing its compliance with WEPA. We therefore reverse and remand the matter, but without the injunction Larsen requested we issue against further construction.[2]

The building is near the west shore of Lake Monona. Larsen lives near the east shore. He alleges that the top floors of the building will obstruct his view of the Capitol building to a height of one-half to two-

---

[1]Larsen requested that we stay further construction pending this appeal. The building is scheduled for completion in August 1992. On December 16, 1991, we entered an order to expedite our decision rather than grant the stay. Briefs were filed on Friday, December 20, 1991, and oral argument was held on December 23, 1991.

[2]Larsen also sought a declaration that, independently of WEPA, the department must comply with the state policy announced in sec. 1, 1989 Wis. Act 222, "to preserve, promote and enhance the view of the state capitol." That policy was announced in connection with a limitation in sec. 16.842, Stats., on the height of buildings located within one mile of the Capitol building. The new building at 101 East Wilson Street will not exceed the limitation. The statute permits certain structures, such as elevator penthouses, to exceed the limitation if approved by the City of Madison. The proposed elevator penthouse will exceed the limitation. The city has approved the proposed elevator penthouse for the building. We affirm dismissal of Larsen's complaint based on the announced policy without further discussion since the statutorily allowed exception removes the penthouse from the policy issue. Therefore, we ultimately affirm the order in part and reverse in part.

thirds of the columns supporting the Capitol dome. Larsen is the only plaintiff, but about 290 other persons have expressed their displeasure in communications of record to the department on the obstruction to the public's view.

Section 1.11(2)(c), Stats., provides in substance that all agencies of the state "shall" include in every report on proposals for "major actions significantly affecting the quality of the human environment" a statement describing the environmental impact of the proposed action, adverse environmental effects which cannot be avoided and alternatives to the proposed action. That statement is usually referred to as an "environmental impact statement" or "EIS." Its preparation is a complex task. For example, before preparing the EIS, the responsible official must consult with and obtain the comments of any agency which has jurisdiction or special expertise with respect to any environmental impact involved. Every proposal other than for legislation must receive a public hearing on notice before a final decision is made. Section 1.11(2)(d), Stats.

To comply with WEPA, an agency contemplating a particular action must decide whether it is a major action significantly affecting the quality of the human environment. This "threshold decision . . . occupies a critical position within the context of WEPA's operation. A negative determination at the initial stage may eliminate to a significant degree environmental consideration by the agency and may curtail much of the input, which an EIS is designed to foster, of other governmental agencies and the public in the agency's decision process." *Wisconsin's Environmental Decade, Inc. v. Public Serv. Comm'n,* 79 Wis. 2d 409, 419, 256 N.W.2d 149, 155 (1977). An agency may comply with the "threshold decision" requirement by promulgating a rule categorizing

755

the decisions which an agency makes according to the likelihood that those decisions will require a review of their environmental consequences. *Wisconsin's Environmental Decade, Inc. v. DILHR,* 104 Wis. 2d 640, 646, 650, 312 N.W.2d 749, 752, 754 (1981).[3]

The facts are undisputed. Early in 1990 the department decided to lease a large block of office space in downtown Madison.[4] It solicited proposals. Of the nineteen submitted, the department narrowed the list down to three, including one by Munz Corporation to construct a building on its site at 101 East Wilson Street. In early November 1990, the department hired a private firm of engineers, architects and planners to prepare a preliminary environmental impact assessment on the three potential building sites. On November 21,

[3]As the supreme court noted in *Wisconsin's Environmental Decade, Inc. v. DILHR,* 104 Wis. 2d at 646, 312 N.W.2d at 752: "In 1976, an executive order, entitled *Revised Order, Guidelines For The Implementation Of The Wisconsin Environmental Policy Act,* Executive Order No. 26 (February 12, 1976), instructed all state agencies to categorize the decisions which they make according to the likelihood that they will require a review of their environmental consequences." We are not certain whether the department adopted the rule we describe in this opinion to comply with that executive order. The rule which the department promulgated does not completely track the *Guidelines.* The state law library has preserved a copy of the order in Wisconsin Legislative Council Reports, Miscellaneous Materials (1977–79), item 8.

[4]We have taken the facts from the affidavits and other documents supporting the motions by both sides for summary judgment. Because both sides moved for summary judgment, and no genuine factual issue appears to exist, we treat the facts submitted by both sides as undisputed and as creating an issue of law. *Powalka v. State Mut. Life Assurance Co.,* 53 Wis. 2d 513, 518, 192 N.W.2d 852, 854 (1972).

1990, after receiving the assessment, the department requested approval from the building commission of a lease for the building to be constructed by Munz on East Wilson Street. The building commission approved the request on the day it was received.

The department's request stated that it proposed to consolidate various tenant agencies in leased or state-owned office space in Madison to accommodate about 1,100 employees. According to the request:

> A 10-story facility will be constructed at 101 E. Wilson Street. Currently the site is used for surface parking. Included in the facility will be approximately 200 underground parking stalls. The building will have a gross area of 189,100 square feet, with a floor size of 18,910 square feet and a net rentable square footage of 160,418 square feet. The lease will be for 20 years and include purchase options at various periods. The purchase price at occupancy will be $18,274,000 or $113.92 per net assignable square feet. The first year rental rate will be $11.25 per square foot plus the cost to operate and maintain the facility. Those costs are estimated to be $4.95 per square foot for a total first year rate of $16.20. The annual first year rent paid to the lessor will be $1,800,000. Rent for the second year will remain the same. For years three through five, the rent will increase 3 percent. Subsequent years, the increase is 4 percent.

> It is anticipated occupancy of the new facility will be August 1, 1992. The lease will also include approval of the building design by the State, including materials to be used in its construction.[5]

[5]In September 1991, the department exercised its option to purchase. Our analysis of the EIS issue is such that neither the option nor its exercise affects our ultimate conclusion.

In the same request, the department informed the building commission:

An environmental assessment [referring to the preliminary environmental impact assessment] has been completed for the 101 E. Wilson Street site. The conclusion of the assessment with regard to constructing the proposed facility is that there will be no significant impact on the quality of the human environment. This analysis fulfills the requirements of the Wisconsin Environmental Policy Act Wis. Statutes 1.11.

Consistently with that conclusion, the department has not prepared the EIS that sec. 1.11(2), Stats., would require had the department concluded that the project does significantly affect the quality of the human environment.

The parties agree, however, that the issue before us is whether the department has followed its own rules that it promulgated to comply with WEPA. In 1982, the department adopted Wis. Adm. Code ch. Adm 60 entitled "Wisconsin Environmental Policy Act, Procedures for Department Actions." As we later explain, the record fails to show that the department has followed that part of ch. Adm 60 which requires it to prepare an EIS for the East Wilson Street project. For that reason, the department has not complied with WEPA. Rather than quote all of Wis. Adm. Code ch. Adm 60, we describe its provisions we deem critical to this appeal.

The department has declared the purpose of ch. Adm 60: To establish a policy to ensure departmental consideration of the short- and long-term environmental and economic effects of department actions; to provide principles, objectives, definitions and criteria to be used by the department when implementing WEPA; to

"[e]stablish the identification of major actions significantly affecting the quality of the human environment and the need for an environmental impact statement"; and to provide an opportunity for public input to the decision making process. Wisconsin Adm. Code sec. Adm 60.01(1)–(4).

To those ends, the department's rules prescribe how it will approach the task of determining whether it will identify a major action significantly affecting the quality of the human environment which in turn necessitates preparation of an EIS. Section Adm 60.03 provides in pertinent part:

> The department has categorized its actions into the following type list which shall determine or aid in the determination of the need for an EIS. *Type I actions shall always require an EIS.* Type II actions may or may not require an EIS . . .. Type III actions normally do not have the potential to cause significant environmental effects . . .. (Emphasis added.)

Accordingly, the department has determined that all Type I actions are, in the words of WEPA, sec. 1.11(2)(c), Stats., "major actions significantly affecting the quality of the human environment."

Section Adm 60.04(1) provides: "During the early planning stages, the department <u>shall</u> determine the need for preparing an EIS on its actions. The action type list <u>shall</u> be used to determine the category of the proposed action." (Emphasis added.)

We have appended to this opinion the action type list promulgated as part of sec. Adm 60.03 and referred to in sec. Adm 60.04(1). It shows that the department has established a single "Type I" EIS category, the first entry on the list. The Type I category is based on one "action type," facilities development, and identified as

"[p]lanning, designing, contracting for and constructing physical facilities when the department of administration is to be the managing authority as defined in ss. 16.84 and 16.845, Stats., i.e. the 'lead agency,' " when the facilities are new and are on parcels not previously developed by the state.

■

The result in this appeal depends on a fundamental principle of administrative law: an administrative agency is bound by the rules which it itself has promulgated, *Vitarelli v. Seaton,* 359 U.S. 535, 539–40 (1959), and may not proceed without regard to its own rules. *Service v. Dulles,* 354 U.S. 363, 388 (1957). We applied the same principles in *State v. Griffin,* 126 Wis. 2d 183, 197, 376 N.W.2d 62, 69 (Ct. App. 1985), *aff'd,* 131 Wis. 2d 41, 60, 388 N.W.2d 535, 542 (1986), aff'd, 483 U.S. 868 (1987); *Prahl v. Brosamle,* 98 Wis. 2d 130, 155, 295 N.W.2d 768, 782 (Ct. App. 1980); *State ex rel. Meeks v. Gagnon,* 95 Wis. 2d 115, 119, 289 N.W.2d 357, 361 (Ct. App. 1980). Wisconsin's Administrative Procedure Act, ch. 227, Stats., embraces the same principle. In a ch. 227 review, a court must reverse and remand a case to the agency if the court finds that the agency's exercise of its discretion "is inconsistent with an agency rule."[6] Section 227.57(8), Stats.

Consequently, if the East Wilson Street project is a Type I action, then it is a major action significantly affecting the quality of the human environment and the department <u>must</u> therefore prepare an EIS. In that event, we ignore the department's representation to the building commission in November 1990 that the project will have no significant impact on the quality of the

---

[6]This, of course, is not a ch. 227 review. We cite ch. 227's embracement of the same principle to show that it pervades the law regarding administrative agencies.

human environment. If the project is a Type I, then, contrary to the department's representation to the commission, its preliminary impact assessment does not fulfill the requirements of WEPA.

We construe administrative rules in the same manner as statutes. *Law Enforcement Standards Bd. v. Village of Lyndon Station,* 101 Wis. 2d 472, 489, 305 N.W.2d 89, 97 (1981). The facts being undisputed, whether the East Wilson Street project is a Type I action, as defined in sec. Adm 60.03, is a question of law. *Employers Ins. v. Pelczynski,* 153 Wis. 2d 303, 307, 451 N.W.2d 300, 301 (Ct. App. 1989). The trial court's answer to that question was negative. The court reached that answer because even though the department was involved in the planning, designing, contracting for and constructing of physical facilities as the lead agency, the facilities were not on land being developed by the state.[7] We, of course, are not bound by the trial court's answer to a question of law. Nor do we defer to it. *Ball v. District No. 4, Area Bd. of Vocational, Technical & Adult Educ.,* 117 Wis. 2d 529, 537, 345 N.W.2d 389, 394 (1984). We decide the Type I question independently, unless we should defer to the department's interpretation of its rule. Ordinarily we defer to an agency's interpretation of a rule which it has written. *Pfeiffer v. Board of Regents,* 110 Wis. 2d 146, 155, 328 N.W.2d 279, 283 (1983).

---

[7]The trial court concluded that the project is a Type II action and therefore ordered the department to prepare an environmental assessment. An environmental assessment is used to determine whether an EIS should be prepared. Wisconsin Adm. Code sec. Adm 60.04(2). The department prepared the assessment, which concluded that no EIS was required. If, as we conclude, the project is a Type I action, an EIS <u>must</u> be prepared.

However, deference to the department's interpretation of sec. Adm 60.03 is not possible in the case before us. The reason is simple. The department did not interpret sec. Adm 60.03, since it did not decide whether the East Wilson Street project is a Type I action. We have searched the record for evidence that the department made that decision. We find none. The record contains no reference whatever to sec. Adm 60.03. It contains no reference, direct or oblique, to whether the East Wilson Street project is a Type I, Type II or Type III. During oral argument, we asked defendants' counsel for the date on which the department made a decision that this was not a Type I action. Counsel could not provide it. We asked counsel whether the department had ever expressly decided that this was or was not a Type I action. Counsel could not answer the question.

That the department properly adopted ch. Adm 60 is unchallenged. The properly adopted rules of an administrative agency have the force of law. *Kranzush v. Badger State Mut. Casualty Co.*, 103 Wis. 2d 56, 77–78, 307 N.W.2d 256, 267–68 (1981). Ordinarily agencies are presumed to have acted in accordance with the law and therefore in accordance with their own rules. *State ex rel. Sell v. Milwaukee County*, 65 Wis. 2d 219, 226–27, 222 N.W.2d 592, 596 (1974). But the department's own procedure overcomes and indeed negates the presumption. The department relied on its preliminary environmental impact assessment when it advised the building commission that constructing the East Wilson Street facility did not require an EIS. Had it applied its own rule, sec. Adm 60.03, and concluded that the project is a Type II, it would have based its decision on the "environmental assessment" described in sec. Adm 60.04(2). Had it concluded that the project is a Type III, it would

have prepared no assessment whatever. The only reasonable inference is that the department either ignored, or proceeded in ignorance of, its own rule. Either alternative prevents us from applying a presumption of regularity.

We conclude that, as a matter of law, the facts satisfy the Type I "action identification" elements of "planning, designing, contracting for and constructing physical facilities." "Action" is the key word. WEPA requires an EIS for "major actions significantly affecting the quality of the human environment." Section 1.11(2)(c), Stats. As sec. Adm 60.03 states: "The department has categorized its actions into the following type list. . . ." For categorization purposes, the department defines "action" as "any activity, initiated by the department or initiated by someone outside state government, which could not have occurred but for the department and which may affect the human environment." Wisconsin Adm. Code sec. Adm 60.02(1).

It is undisputed that the department initiated the planning and contracting for the East Wilson Street site. It participated in the design. Munz's architects did most of the design, and Munz's contractor is performing the actual construction. However, the design and construction could not have occurred but for the department.[8]

---

[8]We conclude from our review of the record that the following facts supply the indicated element or elements of "planning, designing, contracting for and constructing": The state solicited proposals for leasing office space and narrowed the list of nineteen down to three (planning). The state selected the Munz proposal (planning and contracting). Munz "proposed" primary subcontractors, apparently for state approval (contracting). The lease provides that the state shall approve the final plans and specifications (designing). It allows the state to review all bids for

Each of those activities, and surely their total, may affect the human environment. Since the department is the managing authority, as defined in sec. 16.845(2)(b), Stats., all of the "action identification" elements for a Type I EIS category have been met.

We turn to the "description/comments" section applicable to the Type I category. The building at 101 East Wilson Street is a new facility. According to the preliminary environmental impact assessment, the site was previously occupied only by a bituminous parking

---

construction (contracting) and allows the state to add items and moveable equipment to the building (planning and designing). Munz must have a full-time construction representative of the state on the site during construction (constructing). The floor and ceiling plans are to be provided by architects Potter Lawson (contracting). The state has the right of reasonable approval of materials, colors and textures (designing). The purchase of certain materials is subject to state approval (designing). The state agrees to provide Munz with floor layouts of ceiling high partitioning (designing). The state requested the addition of numerous items, including upgraded acoustical tile, carpet squares, computer flooring, extra pumps, a central clock system, and a dock lift (designing). At the state's request, the lease was amended to provide for kitchen and cafeteria areas, to upgrade entrance and elevator lobby areas, to provide break areas, to add shower and locker rooms, and to provide a meeting room on the first floor, as well as other matters (planning and designing). The state provided over 150 pages of state-created construction guidelines and minimum requirements covering, but not limited to, the exterior building envelope, a selection of face brick masonry units, exterior walls, exterior wall flashing, parapet walls, laying and cleaning of new masonry, architectural precast concrete, mortar, sealants in exterior walls, chemical treatment systems, electrical system, basic mechanical system, duct work, fans, etc. (planning and designing).

lot. It is undisputed that the state has never before developed anything on the parcel.

This leaves for our consideration the parcel "not previously developed by the state" element in the "description/comments" section. The state need not own the parcel. Nothing in the Type I category refers to title or ownership.[9] The verb "developed" in the "description/comments" section characterizes the primary elements in the "action identification" section: planning, designing, contracting for and constructing a physical facility. That is what "development" is about. Those elements constitute development, and we have already concluded that the facts satisfy each.

██

We therefore conclude that construction of the building at 101 East Wilson Street comes within the Type I EIS category established by sec. Adm 60.03. It therefore is, in the words of WEPA, sec. 1.11(2)(c), Stats., a major action "significantly affecting the quality of the human environment." For that reason, the department must prepare an EIS. Because the department did not, Larsen is entitled to the declaration he seeks that

---

[9]In this respect, the department's Type I category differs markedly from the *Revised Order, Guidelines for the Implementation of the Wisconsin Environmental Policy Act,* Executive Order No. 26 (February 1976). *See supra* note 3. The *Guidelines* provided in part at page 2, "Each agency should apply the definition of 'significantly affecting the quality of the human environment' to types of actions such as, but not limited to, the following: A. Facilities development: Planning, designing and construction of physical facilities to be owned and operated by state agencies or the state. Examples include highways, buildings and park facilities." The "not limited to" provision shows that an agency could modify the "facilities development" description in the *Guidelines.*

the department has failed to file an environmental impact statement as required by sec. 1.11, Stats.

The issue remains of what, if anything, this court can and should do with respect to the East Wilson Street building construction while the department prepares an EIS. Larsen asks that we enjoin the defendants from continuing with construction of the State Administration Building pending preparation of the EIS. We have jurisdiction under art. VII, sec. 5(3) of the Wisconsin Constitution to issue an injunction in an original action brought in this court, but this is an appeal. We do not have authority to issue an injunction since we lack supervisory jurisdiction over matters pending before administrative bodies. *State ex rel. Swan v. Elections Bd.,* 133 Wis. 2d 87, 91, 394 N.W.2d 732, 734 (1986) (per curiam). The supreme court itself has doubted that it has jurisdiction to issue an injunction where its original jurisdiction has not been invoked. In *State ex rel. Cowie v. La Crosse Theaters Co.,* 232 Wis. 153, 163, 286 N.W. 707, 712 (1939), the court said:

> This court does not, except where the original jurisdiction of the court is directly invoked, grant temporary injunctions. The granting of such injunctions is more appropriately and properly left to the discretion of the trial courts, even if we have jurisdiction to grant injunctions where our original jurisdiction is not invoked in the first instance, which may be doubted and which we refrain from here deciding.

Larsen may apply to the trial court for a temporary injunction to restrain the defendants from proceeding with further construction pending the department's preparation and filing of an EIS. We express no opinion as to whether the trial court should grant the injunction.

*By the Court.*—Order affirmed in part; reversed in part and cause remanded for further proceedings consistent with this opinion. Injunction denied.

| Action Type | Action Identification | Description/Comments | EIS Category | | |
|---|---|---|---|---|---|
| | | | I | II | III |
| Facilities Development | 1. Planning, designing, contracting for and constructing physical facilities when the department of administration is to be the managing authority as defined in ss. 16.84 and 16.845, Stats., i.e. the "lead agency." | a. New facilities on parcels not previously developed by the state | X | | |
| | | b. All others | | X | |
| | 2. Technical assistance to other state agencies in preparation of requests to the state building commission. | | | | X |
| | 3. Ongoing development of facility construction for which a total project EIS has been filed. | a. Major change | | X | |
| | | b. All others | | | X |
| | 4. Advance land acquisition. | | | X | |
| | 5. Monitoring and review of private sector and other governmental projects for impact on department of administration state facilities. | | | | X |
| Financial Assistance | 1. Administration of federal funds to state agencies and local governments. | a. As administering agency | | X | |
| | | b. In another capacity | | | X |
| Standards | 1. Development of statewide construction standards for state building commission. | | | X | |
| | 2. Establishment of statewide standards and standard specifications for purchased materials, equipment or contractual services. | | | X | |
| | 3. Ongoing development of state building commission construction standards. | | | X | |
| | 4. Ongoing development of purchasing standards and standard specifications. | | | X | |
| | 5. Establishment of reasonable alternatives for construction or purchasing standards and standard specifications. | | | | X |
| Regulation | None | | | | |
| Policy Recommendations | 1. Proposals for legislation which significantly change the authority of the department of administration, including those which are recommended to be part of a budget bill. | | | X | |
| | 2. State comprehensive planning. | | | | X |
| Facility and Maintenance Operations | 1. Technical assistance to other state agencies in establishing procedures and priorities for maintenance projects of environmental impact. | | | | X |
| | 2. Major changes in operations and maintenance procedures of facilities under the managing authority of the department. | | | X | |
| | 3. Acting as the state leasing agent. | | | | X |

*History:* Cr. Register, February, 1982, No. 314, eff. 3-1-82.

SUNDBY, J. *(concurring)*. I concur in the result and the court's opinion. I write separately to emphasize that this court cannot excuse the department's failure to prepare an environmental impact statement (EIS) simply because the department has prepared an adequate environmental assessment. The department determined in 1982, when it adopted Wis. Adm. Code sec. Adm 60.03, that: "Type I actions *shall always* require an EIS." (Emphasis added.) An administrative agency is bound by its regulations. *State v. Griffin,* 131 Wis. 2d 41, 60, 388 N.W.2d 535, 542 (1986), *aff'd, Griffin v. Wisconsin,* 483 U.S. 868 (1987). We cannot relieve the department of its duty to comply with sec. Adm 60.03. The sole question therefore is whether the State Administration Building is a Type I action. I conclude that it is.

The department has identified a Type I action as the "[p]lanning, designing, contracting for and constructing physical facilities" on parcels not previously developed by the state. Wisconsin Adm. Code sec. Adm 60.03 *(see* chart, Facilities Development 1). The court's opinion concludes that deference to the department's interpretation of this administrative rule is not possible because the department never decided whether the State Administration Building is a Type I action. The dissent concludes that the department has complied with both the letter and spirit of the Wisconsin Environmental Policy Act (WEPA). I conclude that the opinion of the court is correct. However, to respond to the department's arguments and the dissent's conclusion, I assume solely for purposes of argument that the department, explicitly or implicitly, concluded prior to construction that the proposed building is not a Type I action. Such interpretation of Wis. Adm. Code sec. Adm 60.03 subverts WEPA and therefore is not entitled to deference.

The department argues that the proposed State Administration Building is not planned, designed, contracted for or constructed by the department because the project has been undertaken by the Munz Corporation with private financing. However, state ownership is not the *sine qua non* of a Type I action under Wis. Adm. Code sec. Adm 60.03. This is made clear by sec. Adm 60.02(1) which defines "action" to mean "any activity, *initiated by the department* or initiated by someone outside state government, *which could not have occurred but for the department* and which may affect the human environment." (Emphasis added.)

It is undisputed that this action was initiated by the department, could not have occurred but for the department, and may affect the human environment. Whether the planning, designing, contracting for and constructing a physical facility for the state is a major action requiring an EIS does not depend on the form of the action taken by the state through the department to acquire a new physical facility. The agency which must make the initial determination as to whether an EIS is required and a reviewing court must look to the substance of the action taken. It would subvert WEPA if the department could avoid the requirement of making and filing an EIS by constructing a major facility through the turn-key device.

We do not give the deference usually accorded agency determinations to the department's construction of Wis. Adm. Code sec. Adm 60.03. "It is important to note that the threshold decision whether an EIS should be prepared is not of the usual variety of administrative determination. . . . When a negative EIS determination is challenged, the question is whether the agency itself has complied with the letter and spirit of WEPA." *Wis-*

770

*consin Envtl. Decade v. Public Serv. Comm'n,* 79 Wis. 2d 409, 418–19, 256 N.W.2d 149, 155 (1977).

We will give considerable weight to the agency's decision that an EIS is not required, if it is demonstrated to us that the agency's decision was conducted fully and in good faith. However, we will not defer to an agency decision which excludes, by categorization, a major action from WEPA's application. I am aware that the executive order, as modified, pursuant to which the department adopted Wis. Adm. Code ch. Adm. 60, required state agencies to categorize their actions, as the department has done. *Revised Guidelines for the Implementation of the Wisconsin Environmental Policy Act* (Nov. 1975); Governor's Exec. Order No. 69 at 5 (Dec. 5, 1973). These guidelines are based on the guidelines of the Federal Council on Environmental Quality intended to allow agencies to simplify the procedure involved in the preparation of environmental statements by:

> 1500.4(p)  Using categorical exclusions to define categories of actions which do not individually or cumulatively have a significant effect on the human environment and which are therefore exempt from requirements to prepare an environmental impact statement.

*See Wisconsin Envtl. Decade v. DILHR,* 104 Wis. 2d 640, 664–65, 312 N.W.2d 749, 760–61 (1981) (Heffernan, J., dissenting).

However, the categorization or characterization process may not be used to shield major actions from the WEPA requirements. The use of "generic" or categorical environmental impact statements is discussed in *Agency Decisionmaking Under the Wisconsin Environmental Policy Act,* 1977 Wis. L. Rev. 111, 166–169. The article examines the Action List format developed by the

771

defunct Interagency WEPA Coordinating Committee and the administrative rules implementing that format. *Id.* at 171–79. I agree with the following observation made by the author of the article:

> If rulemaking is initiated, care must be taken to ensure that rulemaking will not work to defeat WEPA's purposes. . . . If agency efforts to promulgate rules are combined with judicial efforts to scrutinize the effects of those rules carefully, agency rulemaking may be more successful in the future than it has been in the past. Judicial scrutiny of agency rulemaking procedures is consistent with new developments in administrative law *[see* Pedersen, *Formal Records and Informal Rulemaking,* 85 Yale L.J. 38, 50, 59–60 (1975)]. Moreover, the benchmark of NEPA litigation—*Calvert Cliffs' v. AEC*—involved judicial refusal to accept agency NEPA rules which did not advance the procedural aims of the statute. Close examination of agency WEPA rules by state courts would be consistent with these precedents.

*Id.* at 178 (footnotes omitted).

Further, it appears that the department's construction of Wis. Adm. Code sec. Adm 60.03 is purely a litigating position. It is inappropriate to defer to an agency's litigating position. *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 212 (1988).

Finally, "[t]he power of an administrative agency to make rules must exist within the framework of the statute creating it and must accord with the policy of such statute." *Beloit Corp. v. LIRC,* 152 Wis. 2d 579, 594, 449 N.W.2d 299, 306 (Ct. App. 1989). The department's suggested construction of Wis. Adm. Code sec. Adm 60.03, does not accord with the policy of WEPA.

EICH, C.J. *(dissenting)*. The appellant, Robert Larsen, asks us to overturn the trial court's dismissal of his action against the Munz Construction Company and the Wisconsin Department of Administration. He acknowledges that he is pursuing a single "environmental" interest in this case: in his words, to "protect his view of the Capitol" from the yard of his lakeshore home. Specifically, he alleges in his complaint that, when completed, the office building now under construction on East Wilson Street by the Munz Corporation for eventual occupancy by the department will obstruct his view of "about one-half to two-thirds of the . . . columns supporting the Capitol dome . . .." He concedes that the action involves no other environmental concern.[1]

The primary relief Larsen seeks is a ruling that the department is required to prepare an environmental impact statement (EIS) because its participation in the planning of the building—under a lease with option to purchase from Munz—fits the classification or "categorization" of actions set forth in its own rules as always requiring one.[2] As will be discussed in more detail below, an EIS—no matter what its content or outcome—would not necessarily require the department to alter its plans

[1]Similarly, because the building will not reach a prohibited height under the State Capitol View Preservation Act, no issue of violation of that law is present in this case. To the extent Larsen complains about an elevator\mechanical "penthouse" on the building's roof, he is pursuing that claim in a separate action. A third action challenges the adequacy of the environmental assessment prepared by the department for the project. None of those issues are before us.

[2]The majority opinion has explained the requirements of the Wisconsin Environmental Policy Act and discussed the facts underlying adoption of Wis. Adm. Code sec. Adm. 60.03 and those points need not be remade here.

in any way. It is a procedural device, not a matter of substantive law; and it does not control the actions or decisions of state agencies.[3]

In any event, the department, after two preliminary environmental studies, determined that no EIS was required for its participation in the project, and the circuit court upheld that determination. On this appeal, however, the majority has concluded that because of what it sees as the department's failure to follow the specific requirements of its "pre-categorization" rules,[4] it will pay no attention to the department's decision and will decide the matter itself. Doing so, the majority construes the applicable departmental rules in a manner resulting not only in reversal of the trial court's order, but, more importantly, in the creation of a precedent that I believe will not well serve the environment or the policies and purposes of the Wisconsin Environmental Policy Act (WEPA) in the future.

---

[3]Larsen also asks us to halt or reverse construction of the building—something we lack authority to do in this action, as the majority opinion indicates.

[4]In brief, the rule classifies activities typically engaged in by the department into three categories. The first category, designated as "Type I Activities," is said to always require preparation of environmental impact statements. "Type II" activities may or may not require an EIS under the rule, depending upon their particular characteristics. For these activities, the rule contemplates preparation of a detailed "Environmental Assessment" to enable the department to determine whether an EIS is warranted in a particular case. The third category—"Type III" activities—are those in which an EIS is probably never necessary (although, again, the rule recognizes that, depending on the particular case, an EIS may be necessary; and where this appears to be so, it directs preparation of a Preliminary Environmental Assessment).

I, too, am troubled by the department's unexplained failure to follow the specific procedures it has set forth in its own rules for complying with WEPA. But it seems to me that, on the somewhat unusual facts of this case, the department has complied with both the letter and the spirit of the act and that its decision that WEPA did not require preparation of an EIS on those facts cannot be said to be irrational or unreasonable and thus was properly affirmed by the trial court.

The department determined that no EIS was needed for the project because, in the words of the Act itself, the building "would not significantly impact the human environment."[5] And it made that determination at two points during the early planning and construction process for the new facility—first, after it had prepared a lengthy "Preliminary Environmental Assessment" of the Munz proposal and two others, and later, after it had prepared a more detailed "Environmental Assessment" of the Munz project alone[6]—and had held public hearings and set aside time for receipt of comments from interested state agencies and members of the public.

It seems to me that two things flow from all this: First, that the department's determination that an EIS was not necessary was a *de facto* determination that it was not engaging in a "Type I" activity under its rule;

[5]WEPA requires preparation of an environmental impact statement for major state agency actions "significantly affecting the quality of the human environment . . .." Sec. 1.11(2)(c), Stats.

[6]The Environmental Assessment was prepared after the trial court ruled that this was a "Type II" activity—one that may or may not require an EIS, depending on the results of an environmental assessment. Regardless of the impetus behind the preparation of the assessment, it is part and parcel of the department's decisionmaking process.

and second, that the department could reasonably so conclude.

When a decision not to prepare an EIS is challenged, the court's basic task is to see "whether the agency . . . has complied with the letter and spirit of WEPA." *Wis. Envtl. Decade v. Pub. Serv. Comm'n,* 79 Wis. 2d 409, 419, 256 N.W.2d 149, 155 (1977) *("Decade I").* It is a question of reasonableness and good faith, and it looks less to the substance of the decision than to the agency's methods and procedures. Thus "the method by which an administrative agency chooses to comply with WEPA's mandate that it take environmental factors into account when undertaking its statutory duties should be affirmed if that method is a reasonable one in light of the purposes of WEPA and the agency's functions and duties." *Wis. Envtl. Decade, Inc., v. DILHR,* 104 Wis. 2d 640, 644-45, 312 N.W.2d 749, 751 (1981) *(Decade III).*

*Decade III* also tells us that we must defer to the agency's interpretation of WEPA requirements, and that we may not upset that interpretation "if there exists a rational basis for [the agency's] conclusion." *Id.,* 104 Wis. 2d at 644, 312 N.W.2d at 751. The majority concludes that the *Decade III* deference rule is inapplicable here because the record does not indicate that the department followed the specific requirements of its own WEPA rules.

I agree that when an agency decides that an EIS is not necessary for a particular project, it must leave a reviewable record "reflecting a preliminary factual investigation covering the relevant areas of environmental concern in sufficient depth to permit a reasonably informed preliminary judgment of the environmental consequences of action proposed . . .." *Decade I,* 79 Wis. 2d at 424-25, 256 N.W.2d at 158. That record, however,

"need not follow any particular form," but need only "reveal in a form susceptible of meaningful evaluation by a court the nature and results of the agency's investigation and the reasoning and basis of its conclusion." *Id.* at 425 n.15, 256 N.W.2d at 158.

It is indeed unfortunate that the department did not pay more attention to its rules along the way. But the fact that it failed to place in the file a statement that it did not consider its participation in the project to constitute "Type I action"—or that it considered the action to be of the "Type II" or "Type III" variety—does not mean that the record in this regard is not "susceptible of meaningful evaluation" within the meaning of *Decade I.* Indeed, in *City of New Richmond v. DNR,* 145 Wis. 2d 535, 544-46, 428 N.W.2d 279, 283-84 (Ct. App. 1988), we upheld the adequacy of an agency's record of a negative EIS determination which was comprised primarily of an "Assessment" which appears to be much the same type of document as the department prepared in this case.

In addition, for an EIS to be required under its rule, the department must be engaged in planning, designing, contracting for *and* constructing a facility on land which it has not previously developed. I believe, as did the trial court, that it is neither irrational nor unreasonable to view that language as requiring the department to be the developer *and* builder, and excluding from the definition of "Type I Activity" a project in which the department's participation is limited to that of a lease/option holder participating in the design of the final structure.[7] Nor, of

[7]In hindsight, it is tempting to look back at the history of this enterprise and, based on the department's participation in its planning and design, conclude that because—in one view, at least—it has looked, walked and quacked like a "Type I" state construction project from the very start, it must always have been

course, was the project being developed on state land.

As a result, the rule of deference adopted by the supreme court in *Decade III* requires us to sustain the department's decision—whether or not we agree with it or consider it wise.

one. The fact remains, however, that when this project began, Munz—who, as a private entity, is not subject to any of the provisions of WEPA—agreed to build the building on its land in an overall size and format that would meet the department's space needs; and it agreed to "personalize" the building to a significant extent—doing so, I presume, on the strength of the state's agreement to lease the building for twenty years (with an option to purchase).

Given that agreement, it seems to me only natural that the department would participate in the planning and interior design of the building to a substantial degree in order to assure that its general needs were met. And, again, it would not be irrational or unreasonable to conclude that such participation would not necessarily elevate the department to the status of "develop[er]" or "construct[or]" within the meaning of the rule.

Nor does the department's subsequent exercise of the option to purchase necessarily change that conclusion. In the early planning and construction phases of the project—the time when, under the law, the EIS decision is to be made—the department was no more than a lessor of the property, albeit one with a purchase option. Surely it cannot be said that had the department waited as long as two or three—or five or ten—years to exercise the option, we could reasonably be asked to go back and order preparation of an EIS. The same result would ensue, I am sure, if only one year had elapsed. I see no difference here, where the department conditionally announced its intent to exercise the option some four or five months after entering into the agreement and formally exercised it some months later upon the legislature's passage of a state budget containing funds for that purpose. Thus, the fact that the department has since exercised its option to purchase seems to be of little consequence.

778

Beyond that, the department appears to have met the requirements of WEPA; and WEPA is, after all, the law the department's rules are designed to implement. The primary purpose of the act is to provide for environmentally-informed decisions in connection with state activities that may have a significant impact on the environment. A concomitant purpose of WEPA, of course, is to allow for comments from the public and other state agencies on the environmental issues associated with such activities. And, as noted above, the "bottom-line" test is one of reasonableness: did the agency's determination that an EIS was not necessary "follow from the results of [its] investigation in a manner consistent with the exercise of reasonable judgment . . .?" *Decade I,* 79 Wis. 2d at 425, 256 N.W.2d at 158.

In this case, the investigations undertaken by the department resulted in a thirty-six-page Preliminary Environmental Assessment and a subsequent forty-six-page Environmental Assessment. The latter document devotes several pages to a description and analysis of the effect of the project on Capitol views from across Lake Monona. And, considering Larsen's complaint and the affidavits he has filed in this case, the assessment appears to accurately describe the nature and extent of the "view obstruction" of which he complains.[8]

---

[8]The document states at one point:

> During the boat survey of the shoreline of the "impacted" shoreline property, it was determined that the new building will partially obstruct the view of the State Capitol from approximately 20 properties along the lakeshore. All of these properties will continue to have an unobstructed view of the Capitol dome. However, the view of the columns supporting the dome will be obstructed, to a greater or lesser degree, by the new building. The maximum obstruction, as viewed from approximately seven private residences and a small neighborhood park, will block the view of the lower 2/3 of the columns. The

In this regard, it is important to keep in mind that WEPA requirements are "procedural in nature, [and do] not control agency decision-making." *City of New Richmond,* 145 Wis. 2d at 542, 428 N.W.2d at 282. WEPA does not mandate particular results or particular decisions in individual cases but simply exists to ensure that adverse environmental effects of a particular project are identified and evaluated during the planning stages. In simplest terms, the act does not prohibit unwise decisions, only uninformed ones. *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350 (1989).[9]

view obstruction will be particularly noticeable at night when the Capitol is lighted.

As to the hearing and record requirements of WEPA, I note that in connection with its preparation of the Environmental Assessment the department convened public hearings on the project and kept the "record" open for thirty days thereafter to receive further comment from the public and other state agencies. As a result, department officials were well-informed of Larsen's concerns and that those concerns were shared, to one degree or another, by nearly 300 other people who contacted the agency to express their opinions in the wake of the public hearings.

[9]Indeed, cases tell us that once the agency has informed itself of the environmental consequences of the proposed action, "the Court may not interfere with the agency's discretion in choosing the action to be taken." *City of Oak Creek v. Milwaukee Metropolitan Sewerage District,* 576 F. Supp. 482, 488 (E.D. Wis. 1983). *See also River Road Alliance, Inc., v. Corps of Engineers,* 764 F.2d 445, 450 (7th Cir. 1985), *cert. denied,* 475 U.S. 1055 (1986), where the court recognized that the question on appeal is not whether the particular activity will affect the environment, or whether some or all members of the court would take a different action under the circumstances, but only whether the agency "exceeded the bounds of its decision-making authority" in concluding that the project would not significantly affect the environment.

780

Thus, while the department admittedly did not follow the Wis. Adm. Code sec. Adm. 60.03 procedures to the letter, it appears to have followed accepted WEPA procedures for determining whether an EIS is necessary, including the convening of public hearings. And because its conclusion that an EIS was not required under its rules was not irrational, but "was reasonable under the circumstances," the requirements of the act have been met. *City of New Richmond,* 145 Wis. 2d at 542, 428 N.W.2d at 282.

It is true that the partial obstruction of the base of the Capitol will diminish somewhat the view of the Capitol enjoyed by Larsen and several of his neighbors, and that is obviously a less-than-desirable result. And I, too, believe that state government should hold itself to a higher standard than private developers when preservation of the Capitol view is at stake. But we are a court of law and, as noted above, there is no claim in this case that the projected building size will violate the only existing law on the subject, the State Capitol View Preservation Act. In addition, as just discussed, the department appears to have followed the procedural mandates of WEPA. Whether either or both those laws are adequate or inadequate, wise or unwise, they govern not only the department's actions but this court's as well. If more is required, it is for the legislature, not this court, to declare.

Finally, I am concerned about the analysis undertaken in the majority opinion. It may well be one that is forced by the "typing" procedures in the department's rules; but I believe that such a process raises serious questions for future cases. In this case, of course, the "typing" analysis will result in the preparation of another assessment of the project's environmental impact. And while that is undoubtedly a welcome result

in any case in which significant environmental interests are at stake, the underlying analysis, if relied on in the future, as it is in the majority opinion, to the exclusion of actual environmental studies of the project in question, can lead to far less desirable results.

By relying on a system of "typing" or "categorization" of various activities normally undertaken by the agency, and then keying the need for preparation of an EIS in a given case to whether the particular project fits the rule's description of a "type" of activity which always, sometimes, or practically never, requires one, the process de-emphasizes—indeed, it ignores—any actual environmental investigations undertaken by the agency in favor of simply "matching" the activity to a description in a preexisting administrative rule. I question whether adherence to such procedures will, in the long run, serve the environmental interests and policies established by WEPA.

The flaw in such an analysis is that it assumes that the purposes of WEPA are better served by looking only to whether the action fits a particular slot in a preexisting rule in determining whether an EIS is warranted, rather than by considering the conclusions and recommendations of actual environmental studies and assessments of the particular project. And although it reaches a result in this case that mandates a third environmental analysis—an EIS[10]—for the project, it does so only by

[10]I have indicated the extent to which the department's Preliminary Environmental Impact Assessment and its Environmental Assessment have covered the subject of obstructions to the Capitol view from across Lake Monona. Because in the preparation of a final EIS the department may, under its rules, engage in a "scoping process" to narrow the issues in the statement so as to "eliminate from detailed study [those] which are not significant or which have been covered by prior environmental review," Wis.

happenstance.

If, for example, the situation were only slightly different from the one presented here—if the classification slot into which the agency action appeared to fit indicated that *no* EIS was necessary, yet independent studies and assessments undertaken by the agency indicated that the action might well have a significant effect on the human environment—the analysis would never reach those studies and assessments; it would end with fitting the action to the predetermined category.[11]

I fear that such an approach may lead future courts to similarly ignore actual studies and assessments suggesting the *need* for a full EIS and reach the opposite result through a nonspecific "pre-categorization" process as long as the activity, in the court's view, fits a "no-EIS-necessary" category in a generally-worded administrative rule. Given the interests at stake in state agency decisions of this type, I would prefer an analysis relying on actual studies and assessments of the project at hand,

---

Adm. Code sec. Adm. 60.05, it is doubtful that, given the prior review undertaken by the department, its discussion of the "view" issue in the EIS will add significantly to the analyses contained in the prior documents.

[11]This case furnishes an example. The majority opinion correctly emphasizes that the "declared . . . purpose" of the department's rules—and WEPA itself—is "to ensure . . . consideration of . . . environmental and economic effects of department actions" and to "identif[y] . . . major actions significantly affecting the quality of the human environment and the need for an environmental impact statement . . .." (Maj. op. at 758–59.) Yet the issue is decided in this case without giving any consideration to the two particularized environmental studies that were prepared for the project, in favor of ascertaining only whether, in the view of an appellate court, the department's participation in the project fit the preexisting, nonspecific descriptions found in the administrative code.

783

rather than one looking only to see whether a general description of agency's activity is round enough to fit a round hole in some preexisting section of the administrative code. It may be time to reevaluate the process.

In sum I disagree with the majority's analysis more than its result. For the reasons just stated, however, I would affirm Judge Jones's order.