Robert W. LARSEN, Plaintiff-Appellant,

v.

MUNZ CORPORATION and the State of Wisconsin Department of Administration and its Secretary, James R. Klauser, Defendants-Respondents-Petitioners.

Supreme Court

*No. 91-2811. Oral argument February 28, 1992.—Decided April 13, 1992.*

(Also reported in 482 N.W.2d 332.)

For the defendants-respondents-petitioners there were briefs by *David J. Harth, Douglas B. Clark* and *Foley & Lardner,* Madison and oral argument by *Mr. Harth.*

For the plaintiff-appellant there was a briefs by *Robert W. Larsen,* Monona and oral argument by *Robert W. Larsen.*

PER CURIAM.

The Munz Corporation (Munz) and the State of Wisconsin Department. of. Administration (DOA) seek review of a published decision of the court of appeals, 166 Wis. 2d 751, 480 N.W.2d 800 (Ct. App. 1992). The court of appeals concluded that the DOA was required to obtain an Environmental Impact Statement (EIS) for the state administration building at 101 East Wilson Street in the City of Madison. That decision reversed, in part, the decision of the Dane County Circuit Court, P. Charles Jones, circuit judge, which determined that an EIS was not required, and instead ordered an Environmental Assessment (EA).

The single environmental concern involves "aesthetics," more particularly, the plaintiff's, Robert Larsen, and the public's view of the columns beneath the dome of the state capitol. Mr. Larsen's view of the dome is not obstructed. His view of part of the columns beneath the dome is obstructed.

The issue is not whether the building exceeds the statutory height limits of the State Capitol Preservation View Act, sec. 16.842, Stats. The building does not exceed the statutory limits.

Nor is there any question raised that the DOA is attempting to hold itself to a lesser environmental standard than would apply to a private citizen or private business such as Munz. It is undisputed that if this were a wholly private development by Munz, it would not implicate any of the Wisconsin Environmental Policy Act's (WEPA) requirements. Here, the DOA has always recognized the applicability of WEPA.

The issue, rather, is whether the DOA was required to obtain an EIS for this project.[1]

In resolving this issue, we must first decide whether the DOA reasonably determined that this building was not a "Type I" action. Under the DOA's rules, any building that is a Type I automatically requires an EIS.

If the DOA's decision that this was not a Type I action was reasonable, we must further decide two questions: 1) whether the DOA's subsequent actions met the procedural requirements of the Wisconsin Environmental Policy Act (WEPA), and 2) whether the DOA's threshold determination that an EIS was not required was reasonable.

---

[1]The dissent concludes that the DOA "did not follow its own rules in this case." *Larsen v. Munz Corporation,* dissent op. at 608. We specifically disavow that conclusion. There is no support for it in this record nor in the law. Although the dissent is unclear as to what "rules" the DOA failed to follow, it appears the dissent is referring to either the "rule" that an EIS was required (which begs the question inasmuch as that is the issue we must resolve), or the "rule" that the DOA must type all its actions as Type I, Type II, or Type III with no exception, or the "rule" that a Preliminary Environmental Impact Assessment together with an Environmental Impact Assessment do not constitute a sufficiently reviewable record. These are not the "rules," these are the dissent's misinterpretations of the "rules." These are not the rules unless a majority of this court says so, which of course we have not and do not.

We conclude that it was reasonable for the DOA to determine that the building was not a Type I action. We agree with the DOA that this project was a "hybrid" in that it did not specifically fit into any of the particular category types contained in the DOA's WEPA regulations.

Such a determination by the DOA, however, does not exempt it from the procedural requirements of WEPA that there be an opportunity for public participation and a reviewable record assembled with respect to the threshold EIS decision. Because the DOA prepared both a Preliminary Environmental Impact Assessment (PEIA) and an EA which afforded the opportunity for public participation and a reviewable record on the question of the threshold EIS decision, we conclude that the DOA fully complied with the procedural requirements of WEPA.

Finally, given the presence of a PEIA and the assumed adequacy of the EA, we further conclude that the threshold decision of the DOA that an EIS was not required was reasonable.[2]

Accordingly, we reverse the decision of the court of appeals.

## I.

We begin with a review of the procedural history of this case. Larsen commenced this action seeking a declaration that the DOA was required to file an EIS under

---

[2]For the purposes of this case only, we assume, without deciding, that the EA prepared in this case was adequate. Larsen has filed a ch. 227 judicial review proceeding challenging the substantive adequacy of this EA. That proceeding, case No. 91-CV-4616, is currently pending in the Dane County Circuit Court, Branch 7.

sec. 1.11, Stats., for this project. He alleged that the top two floors of the proposed ten-story building would obstruct his view of the capitol building, specifically the columns supporting the capitol dome. Larsen was the only plaintiff and as noted, his only environmental objection concerned the building's obstruction of the view of the capitol from his house and a nearby park.

The circuit court rejected Larsen's request that the DOA be ordered to prepare an EIS with respect to this building. Noting that the building was being developed and constructed by Munz, a private organization on private land not previously owned or developed by the state, the circuit court concluded that this proposed action did not constitute a Type I "Facilities development" by DOA under its WEPA regulations, Wis. Admin. Code sec. Adm 60. Instead, the circuit court found this to be a Type II action under Wis. Admin. Code sec. Adm 60.03, and ordered DOA to prepare an EA so as to determine whether an EIS was needed for this building project.

The court of appeals concluded that this was a Type I action within the meaning of Wis. Admin. Code sec. Adm 60.03 and, therefore, that an EIS was required.

## II.

We turn now to a review of the relevant law and legal history surrounding this case. WEPA requires each state agency to consider the environmental implications of all its proposals and before proceeding with any major action significantly affecting the quality of the human environment, prepare a detailed statement—an EIS—concerning the environmental effects of the proposed action. Section 1.11(2)(c), Stats. That statute also requires all state agencies to follow substantially the guidelines of the United States Council on Environmen-

tal Quality (CEQ) which are adopted to facilitate the administration of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4341, *et seq.*, the federal statute on which WEPA is patterned. These CEQ guidelines are found in 40 C.F.R. § 1500, *et seq.* By executive order, the governor of this state has promulgated suggested guidelines for state agencies to follow in complying with WEPA. *See Guidelines for the Implementation of the Wisconsin Environmental Policy Act,* issued by Executive Order No. 69, of December 5, 1973 (hereafter the *Guidelines); Revised Order, Guidelines for the Implementation of the Wisconsin Environmental Policy Act,* Executive Order No. 26 of February 12, 1976 (hereafter *Revised Guidelines).* These guidelines, intended to facilitate administrative decisions under WEPA, are adaptations of the CEQ guidelines and require each state agency to classify its actions into the following categories:

(1) *Type I* actions clearly are major . . . and thus will always require environmental impact statements;

(2) *Type II* actions may or may not be major or significantly affect the quality of the human environment depending on the facts of the particular case, and thus may not require environmental impact statement preparation; . . . and

(3) *Type III* actions are ones where the action could not be major . . . and thus will not require environmental impact statements.
*Revised Guidelines* at 5.

Although WEPA requires the preparation of an EIS for "major actions significantly affecting the quality of the human environment," sec. 1.11(2)(c), Stats., the statute does not define what constitutes "major" action,

what environmental effects are "significant," nor how an agency should make the threshold determination of whether an action requires an EIS. The guidelines for the implementation of WEPA issued by the governor's executive order suggested that each agency should apply the definition of "significantly affecting the quality of the human environment" to various types of agency actions. The *Guidelines* identified several examples of agency actions including:

    (a)  Facilities development: Planning, designing and construction of physical facilities to be owned and operated by state agencies or the state. Examples include highways, *buildings* and park facilities.

    . . .

    (g)  Plans: Formal plans, both short and long term, which through their implementation could have a significant environmental effect. Examples include transportation plans, land use plans, and *facilities* plans.
    *Revised Guidelines* at 2–3 (emphasis added).

DOA, with some modifications, adopted these suggested guidelines as regulations in Wis. Admin. Code sec. Adm 60. DOA's WEPA regulations defined "action" as "any activity, initiated by department or initiated by someone outside state government, which could not have occurred but for the department and which may affect the human environment." Wis. Admin. Code sec. Adm 60.02(1). To facilitate DOA's analysis of whether the proposed action was a "[m]ajor action . . . significantly affect[ing] the quality of the human environment," *Id.* at 60.02(8), DOA categorized its actions into an "action type list." Wis. Admin. Code sec. Adm 60.03. This list categorizes specific agency actions into the three types

noted above. Under the DOA list, the only identified Type I action which would always require the preparation of an EIS is "Facilities development." The DOA list describes "Facilities development" as: "planning, designing, contracting for and constructing physical facilities when the department of administration is to be the managing authority as defined in ss. 16.84 and 16.845, Stats., *i.e.* the 'lead agency,' " when the facilities are "new and are on parcels not previously developed by the state." This description of "Facilities development" is similar but not identical to the "Facilities development" action described in the governor's suggested guidelines.[3] The DOA "Facilities development" action does not include the requirement that the facilities are to be *owned* by the state.

Type I actions under DOA regulations always require an EIS. Type II actions require an EA, and a subsequent EIS only if the EA reveals, on a case-specific basis, that the action involves significant environmental impacts. The CEQ regulations promulgated to implement the NEPA are also applicable to WEPA, *see* sec. 1.11(2)(c), Stats., and *Wisconsin's Envtl. Decade, Inc. v. PSC,* 79 Wis. 2d 409, 428–30, 256 N.W.2d 149 (1977) *(WED III).* Those CEQ regulations also require federal agencies to identify and categorize action types. 40 C.F.R. § 1507.3. If a proposed action by a federal agency does not fit within the CEQ identified action type categories, the agency must prepare an EA, and then based on that EA, make its determination of whether the proposed noncategorical action requires an EIS. 40 C.F.R.

---

[3]It should also be noted that the DOA did *not* include in its WEPA regulations any provision regarding "Plans" as suggested in the *Revised Guidelines* in para. (G). Thus, the DOA "action type list" although it refers to facilities "planning," does not include a specific reference to facilities *plans.*

§ 1501.4(b). Thus, under CEQ regulations, a federal agency is directed to prepare an EA when the proposed agency action does not precisely fit within any of the action type categories—*i.e.*, the ". . . proposed action is one without precedent." 40 C.F.R. § 1501.4(e)(2)(ii).

Because those CEQ regulations also apply to state agencies, when a proposed action by a state agency does not fit the pre-determined action type categories, the state agency is still required to determine whether such an action is a major action that significantly affects the quality of the human environment. This is accomplished by the preparation of an EA which, depending on the conclusions reached in that document, may or may not lead to the subsequent preparation of an EIS. *Id.* at 40 C.F.R. § 1501.4.

## III.

We now review the facts of this case, all of which are undisputed. In 1990, the DOA decided to lease office space in downtown Madison. Proposals were solicited and the DOA subsequently narrowed its selection down to three, including one by Munz which proposed to construct a building on its site at 101 East Wilson Street and then lease that building to the state for DOA offices for a 20-year period; the lease would include an option to purchase which the state could exercise at specified times. In November of 1990, the DOA hired a private firm of engineers, architects and planners to prepare a "Preliminary Environmental Impact Assessment" (PEIA) on the three potential building sites. After receiving that PEIA, the DOA selected the Munz proposal and requested approval from the state building commission for the long-term lease/purchase option. The building commission subsequently approved that request

on November 21, 1990.[4]

The DOA also informed the building commission that the PEIA had concluded the proposed building would have no significant impact on the quality of the human environment and that this analysis fulfilled the requirements of WEPA. Consistent with that conclusion, DOA did not and has not prepared an EIS for this project.

Construction commenced on the building in April, 1991. On June 5, 1991, Larsen commenced this declaratory judgment action. On July 28, 1991, the circuit court determined that the DOA's decision to enter into a lease, containing a purchase option for the building under construction, was a Type II action as defined in Wis. Admin. Code sec. Adm 60.03, and accordingly ordered an EA prepared evaluating the potential environmental impacts of the new building. Because the PEIA the DOA had previously prepared did not examine, evaluate or comment on the Munz site from environmental or aesthetic perspectives, and did not determine whether the proposed action constituted "a major state action significantly affecting the quality of the human environment," the circuit court found the PEIA was not a complete or sufficient EA as prescribed by Wis. Admin. Code sec. Adm 60.02(4). The court, however, refused to enjoin the project pending the preparation and receipt of the EA.

The DOA subsequently prepared and filed an extensive EA containing a description of the proposed building, a summary of the alternatives considered, a description of how the environment might be affected by the building, an evaluation of the significant primary and

---

[4]The lease was signed, and in September of 1991, the state exercised its option to purchase the building. However, as of the date of oral argument in this case, the closing on the purchase of this building by the state had not yet taken place.

secondary effects the building could have on the quality of the environment, a discussion of potential conflicts in the building's use of available resources, and a summary of, and responses to, comments received from the public concerning the building. This supplemental EA also contained specific discussions of potential impacts the building might have on air quality, noise, land use, zoning, historic landmarks, transportation and parking, utility services, urban design and aesthetics, the natural environment, displacement and relocation of office space, and on the economy of Dane County. It also evaluated the affect the building will have on the public's view of the state capitol and detailed the factual investigation the DOA undertook in preparing the EA. Before filing this supplemental EA, DOA provided for a 30-day public comment period and held a public hearing on the draft EA. In November, 1991 the DOA issued the final EA concluding this building would have no significant impact on the quality of the human environment. The DOA then issued a formal determination that its lease/purchase of the Munz building was not a major state action significantly affecting the quality of the human environment, and consequently concluded that an EIS was not required.

Larsen filed an objection in the circuit court challenging the adequacy of this supplemental EA; he also renewed his request that the circuit court order the DOA to prepare an EIS. The circuit court agreed with DOA's argument that any challenge to the substantive adequacy of that EA should be brought in a separate ch. 227 review proceeding;[5] thus, the court declined to address

---

[5]*See* n.1, *supra.* Because the ch. 227 judicial review proceeding is still pending, the issue of the substantive adequacy of the EA prepared in this case is not now before this court in this review.

that issue.

After receiving the EA and hearing arguments from both sides, the circuit court concluded that this EA supplementing the earlier PEIA fully satisfied the procedural requirements of WEPA and the DOA regulations requiring the preparation of an EA for a Type II agency action. Accordingly, the circuit court dismissed Larsen's declaratory judgment action against Munz and the DOA, and also dismissed his claim that the building violated sec. 16.842, Stats.

Larsen appealed. The court of appeals affirmed the dismissal of Larsen's challenge under sec. 16.842, Stats., but reversed that part of the circuit court's order dismissing Larsen's declaratory judgment action which sought a declaration that DOA must prepare an EIS. The court of appeals rejected the circuit court's conclusion that this lease/purchase arrangement was a Type II action by the DOA requiring the preparation of an EA. Instead, the majority of the court of appeals concluded that DOA's lease of the building with an option to purchase constituted the "planning, designing, contracting for and constructing" of a physical facility by the DOA on a parcel not previously developed by the state and was thus a Type I action under Wis. Admin. Code sec. Adm 60.03. Consequently, the court of appeals ordered the DOA to prepare an EIS. The court said it would not defer to the DOA's presumed conclusion that this was a Type III action for which no EIS need be prepared because there was nothing in the record to indicate the DOA ever made a specific determination regarding whether this was a Type I, II or III agency action as defined in Wis. Admin. Code sec. Adm 60.03. The majority further asserted that the only reasonable inference from the record was that the DOA either ignored or proceeded in ignorance of its own regulation.

Therefore the court would not presume that the agency had acted in accordance with the law, *see State ex rel. Sell v. Milwaukee County,* 65 Wis. 2d 219, 226-27, 222 N.W.2d 592 (1974), and would not defer to DOA's determination to not prepare an EIS.

This court granted DOA and Munz' petition to review the court of appeals' decision.

## IV.

The primary issue presented on this review is whether the DOA was required to prepare an EIS. The answer to that question involves several underlying issues.

We turn now to the first of those issues: whether the DOA reasonably determined that this project was not a Type I action. We begin our analysis by noting that Larsen makes no claim that the building will have a significant impact on the human environment with respect to air quality, water pollution, traffic congestion or any other specific environmental concerns other than his sole claim that this proposed building will have an adverse aesthetic impact by partially obstructing the view of the state capitol from his home and from a nearby county park. WEPA, however, protects aesthetic, conservational and recreational interests as well as physical or economic interests. *See Fox v. DHSS,* 112 Wis. 2d 514, 525, 334 N.W.2d 532 (1983) and *Milwaukee Brewers v. DHSS,* 130 Wis. 2d 56, 65, 387 N.W.2d 245 (1986). We neither imply nor suggest any criticism of the plaintiff for bringing this action based solely on the claim that the building will have an adverse aesthetic impact on the state capitol view.[6] Indeed, our prior decisions have

---

[6]We note, however, that aesthetic concerns, without more,

encouraged and recognized individual standing to question compliance with WEPA when it is alleged that agency action will harm the environment in the area where a person resides. *Wisconsin's Envtl. Decade, Inc. v. PSC,* 69 Wis. 2d 1, 230 N.W.2d 243 (1975). Moreover, both NEPA and WEPA seek to encourage effective citizen participation in the administrative process. *See* Special Student Project, Jean M. Hanson, *Agency Decisionmaking Under the Wisconsin Environmental Policy Act,* 1977 Wis. L. Rev. 111, 121. This policy is consistent with Wisconsin's political traditions favoring citizen participation in government. *Id.* at 122 n.47.

In this case, the court of appeals agreed with Larsen's primary argument that DOA failed to comply with its own rules because it did not prepare an EIS for this lease/purchase arrangement, which the court found to be a Type I agency action as that category is defined in Wis. Admin. Code sec. Adm 60.03. The court of appeals said it owed no deference to DOA's decision not to prepare an

have been held to be an insufficient basis for requiring an EIS. In *River Road Alliance v. Corps of Engineers of U.S. Army,* 764 F.2d 445 (7th Cir. 1985), *cert. denied,* 475 U.S. 1055 (1986), the plaintiff challenged an EA based primarily on the aesthetic impacts a proposed barge fleeting facility would have on the view of the Mississippi River near St. Louis. In reversing the district court's decision requiring the Corps of Engineers to prepare an EIS, the 7th Circuit wrote:

> [A]esthetic objections alone will rarely compel the preparation of an environmental impact statement. Aesthetic values do not lend themselves to measurement or elaborate analysis. *See Maryland-National Capital Park and Planning Commission v. U.S. Postal Service,* 487 F.2d 1029, 1038-39 (D.C. Cir. 1973). The necessary judgments are inherently subjective and normally can be made as reliably on the basis of an environmental assessment as on the basis of a much lengthier and costlier environmental impact statement. 764 F.2d at 451.

EIS because there was no indication in the record that DOA interpreted or applied its own regulations in this situation. We disagree with this standard of review.

We apply the test of reasonableness to review a threshold decision under WEPA not to prepare an EIS. *WED III*, 79 Wis. 2d at 423. We apply the same test in this case to the department's conclusion that this was not a Type I action automatically requiring an EIS.

The court of appeals faulted DOA for failing to make a specific determination that this proposed action was not a Type I action under the DOA regulations. We believe that any requirement that the agency issue a specific finding stating that "This is not a Type I action" would exalt form over substance. In this case, the DOA's actions speak louder than the absence of its words. The DOA's actions reveal an implicit determination that this lease/purchase technique was not a Type I action for which an EIS was required. This determination, albeit implicit, is fully reviewable.

We conclude that implicit determination was reasonable under the circumstances presented here. This lease/purchase arrangement for this building does not easily fit within the Type I category defined in the DOA regulations as "Facilities development." The DOA's "action type list" does not include a category describing the lease of a new, privately constructed building for which the state has been given an option to purchase. The agency could reasonably conclude that because this building was privately financed and privately designed and constructed on private property, the lease/purchase option arrangement—especially since DOA had not yet exercised its purchase option—was not a Type I agency

600

action. The DOA's regulations classify as Type I only those actions which involve the department's planning, designing, contracting for, constructing and developing new facilities on property not previously developed by the state. Here the DOA was neither the designer, contractor, constructor, nor developer of this building. The Munz Corporation served those functions—albeit with significant guidance from the DOA. The DOA entered into a long-term lease/option to purchase agreement and significantly contributed to the design of the building, but left the financing, primary designing, contracting, construction and development of the Munz building to a private developer—the Munz Corporation. Under these circumstances, it was eminently reasonable for the DOA to conclude that this was not a Type I agency action.

Moreover, as noted above, the DOA regulations categorizing agency actions are patterned after the guidelines suggested by the governor's executive order. Those original guidelines included a state ownership component in the "Facilities development" Type I category. In the instant case, it was reasonable for DOA to assume that because it would not "own" the building unless and until it exercised its option to purchase, this proposed action was not a Type I action.

In addition, as noted above, the 1976 *Revised Guidelines* included an additional action category entitled "Plans," defined as including "[f]ormal plans, both short and long term, which through their implementation could have a significant environmental effect." Examples for this category included facilities plans. The subsequently adopted DOA regulations did not include this "Plans" category; other agencies likewise failed to include this category as part of their implementation of WEPA. *See* Hanson, 1977 Wis. L. Rev., *supra* at 172 n.

278. This "Plans" category would have specifically applied to facilities—*i.e.,* buildings. In the absence of this specific "Plans" category in the regulations, it was reasonable for the DOA to conclude that the plan for this building, using a long-term lease and an option for the state to purchase the building, was not a type of agency action categorized in the DOA regulations implementing WEPA. Therefore, the DOA could reasonably conclude that this was not a Type I action automatically requiring an EIS. Because there was a rational basis for the DOA's implicit determination that this was not a Type I action, the court of appeals should have deferred to the agency's implicit conclusion that this was not a Type I action automatically requiring an EIS. *See Wisconsin's Envtl. Decade, Inc. v. DILHR,* 104 Wis. 2d 640, 644, 312 N.W.2d 749 (1981).[7]

## V.

The second underlying issue we address is whether the DOA's subsequent actions regarding this project met the procedural requirements of WEPA.

It is undisputed that a wholly private development by Munz would not implicate any of the WEPA requirements; only state agencies are governed by WEPA. Section 1.11(2)(c), Stats. The lease/purchase technique used in this case blurs this distinction because this building will ultimately be owned by the state even though it was constructed by private means. While the applicability of WEPA might be in doubt in this kind of "hybrid" situa-

---

[7]We do not, as the dissent would have it, defer to DOA's failure to follow its rules. *Larsen v. Munz Corporations,* dissenting op. at 614. We simply defer to the agency's reasonable and rationally based implicit determination that this building project was not a Type I action automatically requiring an EIS.

tion, the requirements of the federal counterpart, NEPA extends to private developers where there is a "partnership" with the federal government, such as when federal funds are involved in the construction. *See City of Oak Creek v. Milwaukee Metro Sewerage District,* 576 F.Supp. 482, 489 (E.D. Wis. 1983).

The court of appeals apparently believed that WEPA or DOA's regulations require that each proposed action be "typed" and classified according to the action type list contained in Wis. Admin. Code sec. Adm 60.03, and further, that such typing decision must be a formal, reviewable step in the process specifically identifying whether the proposed action is Type I, II or III. We disagree. There is no such requirement in WEPA, in the guidelines, or in the DOA regulations.

The specific categories listed in the DOA regulations merely permit the agency to pre-determine the need for and the type of environmental review required by WEPA for certain of the agency's actions. This typing or categorization regulation does not purport to result in an exhaustive, all-inclusive list applicable to every possible agency action. Here, the action type list contained in Wis. Admin. Code sec. Adm 60.03 did not identify the technique of using a long-term lease with an option to purchase as a type of facilities development. That does not mean, however, that this arrangement was exempt from WEPA. All it means is that DOA could not, based on a pre-determined categorization list, conclude that this action was or was not a major action significantly affecting the quality of the human environment. If the proposed action did not meet the pre-determined action type categories listed in the DOA regulations, then under the CEQ guidelines (which are also applica-

ble to WEPA, *see* sec. 1.11(2)(c), Stats., and *Wisconsin's Envtl. Decade, Inc. v. DILHR,* 104 Wis. 2d at 663 (Heffernan, J., dissenting)) an EA must be prepared because the nature of the proposed action "is one without precedent." 40 C.F.R. § 1501.4(e)(2)(ii). Here the lease/purchase action was without precedent in the DOA regulations;[8] thus, at a minimum, under the CEQ guidelines, the DOA was required to prepare an EA.

■

We conclude that the DOA, when confronted with this uncategorized development involving a lease/purchase option, appropriately responded by first preparing a PEIA. Moreover, any deficiencies in the format and scope of that PEIA were rectified by the supplemental EA prepared pursuant to the circuit court's order. That EA determined that no EIS was necessary because this building was not a major action significantly affecting the human environment. The PEIA prepared in this case, as buttressed by the court-ordered EA, gave the DOA "a reviewable record reflecting a preliminary factual investigation covering the relevant areas of environmental concern in sufficient depth to permit a reasona-

---

[8]The dissent apparently believes that this project was not an action without precedent under WEPA regulations because the construction of a building was "well within the imagination" of the DOA drafters of the Action Type List. *Larsen v. Munz Corporation,* dissenting op. at 613. We agree that a building project including a lease/purchase agreement is not a new or unique concept or technique. A building constructed by a private developer on private land with the intent to then lease the building to the state on a long-term basis with an option to purchase is *not,* however, one of the pre-categorized action types identified in DOA's regulations. Thus, that technique is an agency action without precedent in the action type list adopted by DOA. It is not a Type I action for which an EIS is always required.

bly informed preliminary judgment of the environmental consequences. . . ." *WED III,* 79 Wis. 2d at 425. The fact that the supplemental EA was prepared pursuant to court order, not agency initiative, is of no moment. As Chief Judge Eich pointed out in his dissent in the court of appeals, "Regardless of the impetus behind the preparation of the assessment, it is part and parcel of the department's decision-making process." 166 Wis. 2d 751, 755 (Eich, C.J., dissenting).

This court has previously held that WEPA does not require an evidentiary hearing regarding the threshold EIS decision. *WED III,* 79 Wis. 2d at 441. We have further recognized that the manner of the proceedings is left to the sound discretion of the agency involved, as long as there is an opportunity for public participation and there is a reviewable record assembled. *Id.* at 442. Moreover, the record need not follow any particular form. *Id.* at 425 n.15. Those requirements were satisfied here. Although public opinion or participation might not have been solicited during the preparation of the PEIA, it is undisputed that following the preparation of the court-ordered EA supplementing that PEIA, there was a 30-day period provided for public comment. In addition, a public hearing was held at which Larsen spoke in opposition to the EA's conclusion that no EIS was required. The PEIA prepared in this case, as supplemented by the EA, provided a reviewable record as to the agency's exercise of its discretion regarding the negative EIS determination. We conclude under the circumstances of this case, that the DOA sufficiently complied with the procedural requirements of WEPA.

Having concluded that the DOA's implicit determination that this was not a Type I project was reasonable, and having further concluded that the DOA met all the procedural requirements of WEPA, we must now determine whether the DOA's threshold decision that an EIS was not required was reasonable.

As we have previously recognized, WEPA is patterned after the NEPA. *WED III,* 79 Wis. 2d at 414; *see also Wisconsin's Envtl. Decade, Inc. v. DNR,* 115 Wis. 2d 381, 395, 340 N.W.2d 722 (1983). Because of the similarity, federal precedent construing NEPA is viewed as persuasive authority in interpreting WEPA. *Wisconsin's Envtl. Decade, Inc. v. PSC,* 79 Wis. 2d 161, 174, 255 N.W.2d 917 (1977). In *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 351 (1989), the United States Supreme Court explained NEPA in the following manner:

> [I]t is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process. . . . If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs. . . . NEPA merely prohibits uninformed—rather than unwise—agency action.

We conclude the process followed in the instant case sufficiently satisfied those requirements. The record reveals the agency decision in this case not to prepare an EIS for this project was informed and reasonable. It was based on the PEIA and the subsequent EA. We assume without deciding that the EA was adequate. Once an

agency has made its fully informed and well-considered decision, a reviewing court may not interfere with agency discretion choosing the action to be taken, or as in this case, the decision not to prepare an EIS. *See Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227–28, (1980).

The procedure followed in this case resulted in a reviewable record reflecting a preliminary factual investigation covering the relevant area of environmental concern—aesthetics[9]—in sufficient depth to permit a reasonably informed preliminary judgment of the environmental consequences of this agency action. *WED III,* 79 Wis. 2d at 425. Because the DOA's determination that this building was not a major action significantly affecting the quality of the aesthetics of the human environment follows from the results of the PEIA and EA

---

[9]Larsen claims that although this building complies with the specific height requirements of the SCVPA, sec. 16.842, Stats., it nevertheless is inconsistent with the legislature's intent expressed in the preamble of the act which was purportedly to preserve the view of the state capitol from the base of the columns up to the dome. According to Larsen, the statutory height restrictions set forth in the statute failed to allow for the effects of perspective, and thus even though the building might comply with the specific height limitations identified in the statute, it could still violate the spirit or intent of the statute. In disposing of this aspect of Larsen's declaratory judgment action, the circuit court concluded the building did not violate the unambiguous height limitations of the statute. The court of appeals affirmed that part of the circuit court's disposition, and Larsen did not seek cross-review on that determination in this court. Even if that issue were properly before this court at this time, we would find it without merit because this building did not violate the clear, unambiguous language of the statute setting forth specific height limitations for new construction within a one-mile radius of the state capitol.

607

investigation conducted in this case, the DOA's threshold decision not to prepare an EIS was reasonable. The test is not whether this court at the outset would have ordered an EIS for this project; rather, the test is whether the DOA's decision not to prepare an EIS was reasonable under the circumstances. *WED III,* 79 Wis. 2d at 423. Because it was, we reverse the court of appeals' decision requiring the DOA to prepare an EIS for this new building which will house the offices of the Department of Administration.

*By the Court.*—The decision of the court of appeals is reversed.

SHIRLEY S. ABRAHAMSON, J. *(dissenting).* The least that the citizens of Wisconsin should expect from state agencies is that they follow their own rules. As is obvious from all the opinions written in this case, trial and appellate, the Department of Administration (DOA) did not follow its own rules in this case. I would therefore affirm the decision of the court of appeals.

Under the Wisconsin Environmental Policy Act (WEPA), all state agencies must consider the impact of their proposed actions on the environment. The courts have the responsibility to see that the agencies do so. To ensure proper consideration of the impact of its actions on the environment, the DOA is bound to follow the rules and procedures it imposed on itself under WEPA in determining whether to prepare an environmental impact statement (EIS). When the DOA decided not to prepare an EIS, it was required to create a reviewable record explaining its decision. In this case, the DOA, with the majority's stamp of approval, neither prepared an EIS nor created a reviewable record.

While some might be concerned that the majority's decision severely weakens the need for agencies to comply with their rules and with WEPA, it is evident from this *per curiam* opinion that the decision in this case is like "a restricted railroad ticket, good for this day and train only." *Smith v. Allwright,* 321 U.S. 649, 669 (1944) (Roberts, J., dissenting).

Because I believe that according to its own rules the DOA must prepare an environmental impact statement, I dissent and I would affirm the holding of the court of appeals.

The purpose of the Wisconsin Environmental Policy Act[1] is to ensure that administrative agencies consider the environmental impact of their proposed actions. WEPA does not mandate a particular decision in an individual case. The statute requires an agency only to identify and evaluate the environmental effects of a particular project while planning for the project. In sum, WEPA protects against an agency's uninformed decisions, not against an agency's unwise decisions.[2] The substance of WEPA is the procedure the agencies must follow to ensure informed decision-making.[3]

[1] The Wisconsin Environmental Policy Act has become so synonymous with environmental *protection* that the decision of the court of appeals and the DOA's brief both refer to the statute as the Wisconsin Environmental *Protection* Act.

[2] Federal courts have similarly interpreted the National Environmental Policy Act. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350–51 (1989); *City of Oak Creek v. Milwaukee Metro. Sewerage Dist.,* 576 F. Supp. 482, 488 (E.D. Wis. 1983).

[3] *Wisconsin's Envtl. Decade, Inc. v. Public Serv. Comm'n,* 79 Wis. 2d 409, 416, 256 N.W.2d 149 (1977) *(WED III); City of New Richmond v. Dep't of Natural Resources,* 145 Wis. 2d 535, 542, 428 N.W.2d 279 (Ct. App. 1988).

In 1976, the Governor ordered all state agencies to comply with Revised Guidelines designed to implement WEPA.[4] Accordingly the DOA enacted Wis. Admin. Code sec. Adm 60, the DOA rules applicable to this case. (For the full text of chapter Adm 60, see appendix.) Complying with the Executive Order, the DOA rules, sec. Adm 60.03, set forth an Action Type List that categorizes all of the DOA's actions[5] as Type I, II, or III for purposes of determining the need for an EIS. Type I actions "shall always require an EIS"; Type II actions require at least an environmental assessment (EA); and Type III actions are presumed not to require an EIS or an EA.[6]

---

[4]*Revised Order, Guidelines for the Implementation of the Wisconsin Environmental Policy Act,* Executive Order No. 26 (February 12, 1976).

[5]The DOA rules define "action" as "any activity, initiated by the department or initiated by someone outside state government, which could not have occurred but for the department and which may affect the human environment." Section Adm 60.02(1). See appendix. The DOA does not dispute that the project in issue in this case constitutes an action under these rules.

[6]Because the preparation of an EIS is time consuming and because agencies "may very well approach the question [of an EIS] with a bias favoring a negative conclusion," *WED III,* 79 Wis. 2d at 420, the Revised Guidelines require all state agencies to create similar lists to implement WEPA. See *Wisconsin's Envtl. Decade, Inc. v. ILHR Dep't,* 104 Wis. 2d 640, 646, 312 N.W.2d 749 (1981). These Type Lists typically comprise three categories.

The Type Lists allow agencies to defend more ably a determination not to write an EIS and provide the public and the courts with a means to review an agency decision more easily. For examples of other agencies' type lists, see sec. ILHR 1.06, Wis. Admin. Code (Department of Industry, Labor and Human Relations), and sec. NR 150.03, Wis. Admin. Code (Department of Natural Resources).

The DOA rules mandate that the DOA use the Action Type List to determine whether an EIS is needed for the particular action under consideration. Section Adm 60.04(1) states that the "action type list *shall* be used to determine the category of the proposed action." (Emphasis added.)

Although the DOA rules *require* the DOA to determine whether the building was a Type I, II, or III action, not one judge reviewing the record in this case could find anything demonstrating that the DOA had expressly considered the Action Type List contained in sec. Adm 60.03. During oral argument the court of appeals asked counsel for the DOA whether the DOA had ever expressly decided the action type and if so when. Counsel could not answer the question. *Larsen v. Munz Corp.,* 166 Wis. 2d 751, 762 (Ct. App. 1992).

Deciding on the action type is not a mere technicality, not an extra hoop through which an agency must jump. It is necessary for compliance with WEPA, an Executive Order, and the DOA's chapter Adm 60 rules.

Furthermore, when determining that no EIS is required, the DOA must develop a reviewable record, showing that it took a "hard look" at the environmental consequences involved in the project. *Wisconsin's Envtl. Decade, Inc. v. Public Serv. Comm'n,* 79 Wis. 2d 409, 420, 425, 256 N.W.2d 149 (1977) *(WED III).* The court must subject an agency's decision not to prepare an EIS, and the record on which it is based, to a "searching inquiry." 79 Wis. 2d at 420.[7] The burden of showing

---

[7]The reason for this careful scrutiny was described by this court as follows:

> The threshold decision whether to prepare an EIS occupies a critical position within the context of WEPA's operation. A negative determination at the initial stage may eliminate to a significant degree environmental consideration by the agency and may curtail much of

611

compliance with WEPA is on the DOA. 79 Wis. 2d at 430.

Although the majority opinion professes to follow *WED III*, it cannot conduct a searching inquiry because the DOA created no record to review regarding whether this building was a Type I action. Instead, the majority opinion apparently rests on the following reasoning: Because the DOA did not order an EIS, which is required in Type I actions, the DOA must have *implicitly* determined that the building was not a Type I action. This reasoning might have merit if the majority could find any evidence to support its claim. The majority's reasoning fails, however, because the DOA's conduct is inconsistent with the majority's reasoning and because the majority's opinion is internally inconsistent.

The inconsistencies become evident when examining the majority's conclusion that the DOA *implicitly* decided the building did not fall under any category of the three action types on its action type list. The majority states that when an agency determines that a proposed action does not fall under any category on its action type list, the agency must prepare an environmental assessment. Majority opinion at 603–604. In clear contradiction of the requirement it just stated, the majority then claims that when confronted by the supposedly uncategorized action the DOA "appropriately responded" by preparing a preliminary environmental impact assessment (PEIA). Majority opinion at 604. If

the input, which an EIS is designed to foster, of other governmental agencies and the public in the agency's decision process. It is obvious that achievement of WEPA's goals will be significantly compromised if ill-advised determinations not to prepare an EIS are permitted by the courts to stand. Thus a consideration of the manner in which WEPA was intended to function dictates a liberal approach to the threshold decision of whether the impact statement should be prepared. *WED III*, 79 Wis. 2d at 419.

the DOA had concluded that the action was uncategorized, the preparation of an environmental assessment would have been the appropriate response.[8] Thus, the DOA's conduct is not consistent with the majority's reasoning about the DOA's making *implicit* determinations, and the majority's reasoning is not internally consistent.

Moreover, it appears that the concept underlying the Action Type List, sec. Adm 60.03, is that the list encompass all potential agency actions. By assigning each action to a category on the list, an agency could easily and uniformly determine the procedures necessary to comply with WEPA. The Executive Order under which the DOA adopted its sec. Adm 60 rules requires each agency "to list *all* of its actions under one or more of the categories," to "maintain an updated list of *all* categories of actions taken by the agency," and "to ensure that *all* agency actions have been listed."[9] The majority concludes that, because the building involves a long-term lease with an option to purchase, the action is "without precedent." Majority opinion at 604. The majority opinion misses the point: WEPA is concerned with the impact of agency actions on the environment, not with financing schemes. The construction of a build-

---

[8]The DOA prepared only a preliminary environmental impact assessment (PEIA). The circuit court found that the DOA's PEIA did not correspond to an environmental assessment. The circuit court found that the PEIA was inadequate because it did not evaluate the environmental or aesthetic aspects of the *Munz* project and did not determine whether the proposed action constituted a major state action significantly affecting the quality of the human environment. Majority opinion at 595.

[9]*Revised Guidelines for the Implementation of the Wisconsin Environmental Policy Act* 5 (February 1976) (emphasis added).

ing was well within the imagination of the DOA personnel who drafted and adopted the Action Type List.

The only inference to be drawn from the majority's reasoning and from the record is that the DOA never determined the action type, thereby ignoring its own sec. Adm 60 rules or proceeding in ignorance of them. The court of appeals drew this inference. I agree with the court of appeals.

After constructing the DOA's *implicit* determination that the building was not a Type I action and no EIS was needed, the majority applies *Wisconsin's Envtl. Decade, Inc. v. Public Serv. Comm'n,* 79 Wis. 2d 409, 419, 256 N.W.2d 149 (1977) *(WED III),* to examine whether the *implicit* determination that the building was not a Type I action was reasonable. The majority gives deference to the DOA's *implicit* determination. Because the DOA did not determine whether the building constitutes a Type I, II, or III action, or even an uncategorized action, the court should not grant deference to the DOA's failure to follow its rules, as the majority does. Moreover, because the DOA never made the determination that the majority infers, nor created a record of its determination, the majority cannot examine the "reasonableness" of the DOA's determination.

The majority constructs its own after-the-fact rationale to persuade themselves and the public of the reasonableness of the DOA's *implicit* determination that the building is not a Type I action. Even assuming arguendo that the "reasonableness" standard is appropriate, the majority's after-the-fact construct is not persuasive.

Under the DOA's rules the only Type I action is the development of "new facilities" on "parcels not previously developed by the state." Facility development is defined as "[p]lanning, designing, contracting for and constructing physical facilities when the department of

administration is to be the managing authority as defined in ss. 16.84 and 16.845, Stats.; i.e. the 'lead agency.' " Section Adm 60.03. (See appendix.)

In evaluating the "reasonableness" of the DOA's "implicit determination" that the building is not Type I, the majority first claims that the DOA did not serve as the "designer, contractor, constructor, nor developer" of the building. Majority opinion at 600. The majority's application of the rule assumes that in order for the building to be a Type I action the DOA must be the *sole* designer, contractor, constructor, or developer of the building. The language of the rule does not support this interpretation.

The DOA clearly engaged in planning, designing, contracting for and constructing the building. The majority concedes that the DOA gave the Munz corporation "significant guidance" in all these activities. Majority opinion at 601. "Significant guidance" is a significant understatement of the DOA's involvement in the building. The lease provides that the DOA *shall* approve final plans and specifications, review bids for construction, and approve the purchase of certain materials. The DOA also provided Munz with 150 pages of construction guidelines and, according to the lease, Munz was required to retain a full-time state construction representative on the site during construction. Finally, the DOA requested the addition of numerous design upgrades, including the addition of kitchen and cafeteria areas, showers and locker rooms, and a meeting room.[10]

---

[10]The circuit court found that the DOA was "intimately" involved in planning and development. The circuit court categorized the building as a Type II action, however, because the court incorrectly interpreted sec. Adm 60.03 as stating that Type I actions may only occur "on land being developed by the state." Memorandum Decision at 6. Section Adm 60.03 does not require

The majority alternatively asserts that in reaching its decision that the building was not a Type I action, the DOA *implicitly* referred to the 1976 Governor's Revised Guidelines which stated that Type I actions involve facilities "to be owned" by the state. Majority opinion at 601.[11] The DOA rules, sec. Adm 60.03, omitted the words "to be owned" from its Type I action list. Even if the DOA rules contained these words, the DOA would still need to prepare an EIS, because the lease-purchase agreement clearly allows for the possibility, indeed the probability, that the building at issue is "to be owned" by the state or a state agency.

In sum, the majority simply ignores that WEPA is designed to force agencies to include environmental factors in their decision-making processes. See *WED III,* 79 Wis. 2d at 416; sec. Adm 60.01(1). Under WEPA, agency decision-makers must acquire and consider all relevant environmental information before they commit resources to a project. *Wisconsin's Environmental Decade, Inc. v. DNR,* 94 Wis. 2d 263, 271, 288 N.W.2d 168 (Ct. App. 1979) (citation omitted). The DOA did not comply with either the letter or spirit of its rules for implementing WEPA. The majority allows the DOA to evade its responsibilities under the law, sending an unfortunate message to the citizens of this state who must obey agency rules or suffer the consequences.

---

that a Type I action occur "on land being developed by the state," but only that the planning, designing, contracting for, and constructing occur on "parcels not previously developed by the state."

[11]The Revised Guidelines define "facilities development" as "[p]lanning, designing and construction of physical facilities *to be owned* and operated by state agencies or the state." *Revised Guidelines* at 2 (emphasis added). See Majority opinion at 592.

Government officials must be held strictly responsible for following the rules they adopt. If we do not hold government officials to this standard, we invite ad hoc judgments that increase opportunities for government abuse. The United States Supreme Court has held that when an agency adopts rules to govern its decision-making, even when a statute grants the agency absolute discretion in making the decision, the agency must follow those rules. *Service v. Dulles*, 354 U.S. 363, 388 (1957); *Vitarelli v. Seaton*, 359 U.S. 535, 539–40 (1959).[12]

The United States Court of Appeals for the District of Columbia Circuit stated the principle of holding an agency to its own rules as follows:

> [I]t is elementary that an agency must adhere to its own rules and regulations. *Ad hoc* departures from those rules, even to achieve laudable aims, cannot be sanctioned . . . for therein lie the seeds of destruction of the orderliness and predictability which are the hallmarks of lawful administrative action. Simply stated, rules are rules, and fidelity to the rules which have been properly promulgated, consistent with applicable statutory requirements, is required of those to whom Congress has entrusted the regulatory missions of modern life.

*Reuters Ltd. v. F.C.C.*, 781 F.2d 946, 950–51 (D.C. Cir. 1986).

If the DOA believes that the sec. Adm 60 rules it promulgated to implement WEPA provide for the prepa-

---

[12]See also *Center for Auto Safety v. Dole*, 828 F.2d 799, 806 (D.C. Cir. 1987); *State ex rel. Riley v. DHSS*, 151 Wis. 2d 618, 623, 445 N.W.2d 693 (Ct. App. 1989); *State ex rel. Meeks v. Gagnon*, 95 Wis. 2d 115, 119, 289 N.W.2d 357 (Ct. App. 1980); sec. 227.57(8), Stats. 1989–90.

ration of an EIS in more cases than WEPA requires, the DOA must amend its rules, not ignore them.

For the reasons set forth, I would affirm the decision of the court of appeals.

## APPENDIX
## DEPARTMENT OF ADMINISTRATION

### Chapter Adm 60

### WISCONSIN ENVIRONMENTAL POLICY ACT, PROCEDURES FOR DEPARTMENT ACTIONS

| | | | |
|---|---|---|---|
| Adm 60.01 | Purpose | Adm 60.07 | Distribution and review of the DEIS and FEIS |
| Adm 60.02 | Definitions | | |
| Adm 60.03 | Department action type list | Adm 60.08 | Public hearings on the DEIS and FEIS |
| Adm 60.04 | Determination of need for an EIS | | |
| Adm 60.05 | Scoping | Adm 60.09 | Record of decision |
| Adm 60.06 | Contents of an EIS | | |

**Adm 60.01 Purpose.**  The purpose of this chapter is to:

(1)  Establish a policy to assure departmental consideration of the short and long term environmental and economic effects of department actions upon the human environment.

(2)  Provide principles, objectives, definitions and criteria to be used by the department in the implementation of s. 1.11, Stats. Implementation includes the evaluation of proposed actions; the study, development and description of alternatives where proposed actions involve unresolved conflicts in the use of available resources; and the preparation and review of environmental impact statements.

(3) Establish the identification of major actions significantly affecting the quality of the human environment and the need for an environmental impact statement.

(4) Provide an opportunity for public input to the decision-making process.

**Adm 60.02 Definitions.** (1) "Action" means any activity, initiated by the department or initiated by someone outside state government, which could not have occurred but for the department and which may affect the human environment.

(2) "Alternatives" means other actions or activities which may be reasonably available to achieve the same or altered purpose of the proposed action, including the alternative of no action.

(3) "Department" means the department of administration.

(4) "EA" or "environmental assessment" means a documented brief but comprehensive analysis of a proposed Type II action to determine its environmental impact; to study, develop, and thoroughly describe alternatives; and to determine whether the proposed action constitutes a major state action significantly affecting the quality of the human environment or involving unresolved conflicts in the use of available resources.

(5) "EIS" or "environmental impact statement" means a written report prepared pursuant to s. 1.11, Stats., which contains an analysis of anticipated impacts of a proposed action, and alternatives to the proposed action, upon the human environment. The draft environmental impact statement (DEIS) is a preliminary version of the final environmental impact statement (FEIS).

(6) "Finding of no significant impact" means a completed environmental assessment which indicates

that the proposed action is not a major action which will significantly affect the quality of the human environment and that no EIS is required.

(7) "Human environment" means the totality of conditions and influences, both natural and artificial, which surround and affect all organisms, including people.

(8) "Major action" means an action which will significantly affect the quality of the human environment.

(9) "Resources" means financial, cultural and natural matter and forms as well as labor and materials used and affected by a proposed action if permitted.

(10) "Significant effects" means the considerable and important impacts, beneficial or adverse, of actions on the quality of the human environment.

**Adm 60.03 Department action type list.** The department has categorized its actions into the following type list which shall determine or aid in the determination of the need for an EIS. Type I actions shall always require an EIS. Type II actions may or may not require an EIS, depending on the significance of the action, or may or may not involve unresolved conflicts in the use of available resources. All Type II actions shall be evaluated by using an EA. Type III actions normally do not have the potential to cause significant environmental effects and normally do not involve unresolved conflicts in the use of available resources. Unless the department determines otherwise, these actions will not require an EA or EIS. If a particular Type III action or a particular uncategorized action is found by the department to involve unresolved conflicts in the use of available resources, the department shall comply with Adm 60.04(3).

| Action Type | Action Identification | Description/ Comments | EIS Category I | II | III |
|---|---|---|---|---|---|
| Facilities Development | 1. Planning, designing, contracting for and constructing physical facilities when the department of administration is to be the managing authority as defined in ss. 16.84 and 16.845, Stats., i.e. the "lead agency." | a. New facilities on parcels not previously developed by the state | X | | |
| | | b. All others | | X | |
| | 2. Technical assistance to other state agencies in preparation of requests to the state building commission. | | | | X |
| | 3. Ongoing development of facility construction for which a total project EIS has been filed. | a. Major change | | X | |
| | | b. All others | | | X |
| | 4. Advance land acquisition. | | | X | |
| | 5. Monitoring and review of private sector and other governmental projects for impact on department of administration state facilities. | | | | X |
| Financial Assistance | 1. Administration of federal funds to state agencies and local governments. | a. As administering agency | | X | |
| | | b. In another capacity | | | X |

621

| Action Type | Action Identification | Description/ Comments | EIS Category | | |
|---|---|---|---|---|---|
| | | | I | II | III |
| Standards | 1. Development of statewide construction standards for state building commission. | | | X | |
| | 2. Establishment of statewide standards and standard specifications for purchased materials, equipment or contractual services. | | | X | |
| | 3. Ongoing development of state building commission construction standards. | | | X | |
| | 4. Ongoing development of purchasing standards and standard specifications. | | | X | |
| | 5. Establishment of reasonable alternatives for construction or purchasing standards and standard specifications. | | | | X |
| Regulation | None | | | | |
| Policy Recommendations | 1. Proposals for legislation which significantly change the authority of the department of administration, including those which are recommended to be part of a budget bill. | | | X | |
| | 2. State comprehensive planning. | | | | X |

622

| Action Type | Action Identification | Description/ Comments | EIS Category | | |
|---|---|---|---|---|---|
| | | | I | II | III |
| Facility and Maintenance Operations | 1. Technical assistance to other state agencies in establishing procedures and priorities for maintenance projects of environmental impact. | | | | X |
| | 2. Major changes in operations and maintenance procedures of facilities under the managing authority of the department. | | | X | |
| | 3. Acting as the state leasing agent. | | | | X |

**Adm 60.04 Determination of need for an EIS.** (1) During the early planning stages, the department shall determine the need for preparing an EIS on its actions. The action type list shall be used to determine the category of the proposed action.

(2) In determining whether a Type II action is a major action that will significantly affect the quality of the human environment, or is a proposed course of action which involves unresolved conflicts concerning alternative uses of available resources, the department shall base its decision on an environmental assessment (EA) which shall contain the following information:

(a) A brief description of the proposed action including maps and graphs if applicable.

(b) A brief description of those factors in the human environment affected by the proposed action.

(c)　A brief evaluation of significant primary and secondary environmental effects that would result if the proposal were implemented.

(d)　A brief study, development and description of reasonable alternatives to the proposed action and a brief evaluation of the significant environmental or other effects of these alternatives.

(e)　A listing of other agencies or groups contacted and the comments of and other pertinent information from these agencies and groups.

(f)　An evaluation section which contains brief discussions of the following specific factors:

1.　Stimulation of secondary (indirect) effects.

2.　Creation of a new environmental effect.

3.　Impacts on geographically scarce environmental features.

4.　Precedent-setting nature of the action.

5.　Significant controversy associated with the action.

6.　Conflicts with official agency plans or local, state, or national policy.

7.　Cumulative impacts of repeated actions of this type.

8.　Foreclosure of future options.

(g)　An identification and brief discussion of appropriate alternatives to proposed Type II actions that may involve unresolved conflicts concerning alternative uses of available resources, including the alternative of no action. A proposed action involves unresolved conflicts concerning alternative uses of available resources when

1.　The proposed action may reasonably be expected to materially use or affect a resource, temporarily or permanently; and

2.　The resource is reasonably suited to one or more other uses; and

624

3. There is a discernible conflict, competition, difference or incompatibility between the use to be made of the resource by the proposed action and another use, including the present use, to which the resource is reasonably suited; and

4. The conflict, competition, difference, or incompatibility between the proposed action's use and the other uses to which the resource is reasonably suited cannot be avoided or resolved if the proposed action is implemented.

(3) If it is determined that there are unresolved conflicts concerning alternative uses of available resources in a proposed Type II action, then the department shall study, develop and thoroughly describe the appropriate alternatives.

(4) The department shall issue a news release to news media in the vicinity of the proposed action for each EA, including the following information:

(a) A brief description of the project, including location.

(b) A contact person within the department who can provide copies of the EA and answer questions.

(c) A date by which the department will receive and consider comments before making its final decision on the need for an EIS.

(5) Following the deadline for receipt of public comment on the EA, the department shall review the assessment, consider all public comments, make required comments, and approve the assessment. A public hearing may be held to receive public input and aid in the review of and decision on the need for an EIS.

(6) If a finding is made in the EA that no EIS is required for a proposed Type II action, the original EA shall then be filed by the department in its Madison, Wisconsin office as a finding of no significant impact.

The assessment is a public record which is available for review upon request.

(7) If a finding is made in the EA that an EIS is required for a proposed Type II action, the department shall prepare a DEIS and an FEIS.

**Adm 60.05 Scoping.** (1) As soon as possible after the decision to prepare an EIS, the department shall inform the public and affected agencies that an EIS will be prepared and that the process of identifying potential major issues, called scoping, is beginning.

(2) The scoping process shall include, to the extent possible, affected and other interested persons. The process may consist of meetings, hearings, workshops, surveys, questionnaires, interagency committees, or other appropriate methods or activities, and may be integrated with other public participation requirements.

(3) The department shall use the scoping process to accomplish any of the following:

(a) Determine the scope and the significant issues to be analyzed in depth in the EIS.

(b) Identify and eliminate from detailed study the issues which are not significant or which have been covered by prior environmental review. This will narrow the discussion of these issues in the EIS to a brief presentation of why they will not have a significant effect on the human environment or a reference to their coverage elsewhere.

(c) Set a time schedule for document preparation and opportunities for public involvement.

**Adm 60.06 Contents of an EIS.** (1) When an EIS is required, a DEIS and an FEIS shall be prepared by the department or prepared for the department under contract by a consultant with supervision and final editorial review by the department. The DEIS shall emphasize significant environmental issues identified during

the scoping process. The FEIS shall be based in part upon comments received on the DEIS and on information received from other sources. An EIS shall provide analysis of the environmental and economic implications of a proposed action contemplated by the department. An EIS shall include the following:

(a) A description of the proposed action and of the affected environment including the project location, type of facility, time schedules, maps and diagrams deemed relevant, and other pertinent information which will adequately allow an assessment of the potential environmental impact by persons who want to make comments.

(b) The probable impact of the proposed action on the human environment. An evaluation will be made of the positive and negative effects of the proposed action as it relates to the environment. Secondary as well as primary consequences to the environment will be included wherever possible.

(c) Alternatives to the proposed action, including a rigorous exploration and objective evaluation of the environmental impacts of all reasonable alternatives, particularly those that might avoid all or some of the adverse environmental effects of the proposed action. Consideration will be given to the economic advantages and disadvantages and energy impacts of each alternative wherever possible.

(d) Probable adverse environmental effects which cannot be avoided should the proposal be implemented. Protective and mitigative measures to be taken as part of the proposed action shall be identified.

(e) The relationship between short-term uses of the environment and the maintenance and enhancement of long-term productivity. The EIS shall describe the extent to which the proposed action involves tradeoffs between short-term economic gains at the expense of

627

long-term environmental productivity or vice versa, and the extent to which the proposed action forecloses future options.

(f) Significant irreversible and irretrievable commitments of resources that would be involved in the proposed action if implemented, including a statement identifying the extent to which the proposed action irreversibly curtails the range of potential uses of the environment.

(g) A summary of the scoping process used and the major issues identified for detailed analysis in the EIS.

(h) The FEIS shall discuss at appropriate points any responsible opposing view not adequately discussed in the DEIS.

(i) If the department makes substantial changes in the proposed action that are relevant to environmental concerns, or if there are significant new circumstances or information relevant to environmental concerns that have bearing on the proposed action or its impacts, that arise after preparation of the FEIS, but before substantial implementation of the action, the department shall prepare supplements to the FEIS. If a supplement is prepared it shall be distributed and reviewed in the same manner as a DEIS or a FEIS as provided in Adm. 60.07.

(2) The EIS shall be an analysis document that enables environmental factors to be considered in the development of a proposed action. It shall be considered by the department in the decision-making process.

(3) The EIS is not a document of justification. Furthermore, disclosure of adverse environmental effects shall not necessarily require that a proposed action be denied or terminated.

(4) Environmental impact statements shall be written in plain language and should use appropriate graphics to aid decision-makers and the public. Where

appropriate, an EIS may be combined with other required environmental or planning documents.

**Adm 60.07 Distribution and review of the DEIS and FEIS.** (1) Distribution and review of the DEIS. (a) Copies of the DEIS shall be distributed as follows:

1. The governor's office.

2. State, federal and local government agencies having special expertise, interest or jurisdiction.

3. Regional and county planning agencies located within the proposed project or action area.

4. The department of natural resources.

5. Libraries:

a. For proposed actions affecting a local area, the nearest library. In addition, the county clerk or town clerk will be requested to make the document available in the the county courthouse, city hall or town hall.

b. For projects of regional importance, public libraries with geographic distribution which provides public access without undue travel.

c. Projects having statewide significance, public libraries providing reasonable access by the individuals who would be potentially affected by the proposed action.

(b) *Notice of availability of the DEIS.* 1. An announcement sheet giving a brief description of the proposed action, a description of the administrative procedures to be followed, the date by which comments on the DEIS are to be submitted to the department, and the location where copies of the DEIS are available for review, shall be circulated as follows:

a. All local and regional units of government which have jurisdiction over the area that may be affected by the proposed action. A request will be made for posting

the announcement sheet at the place normally used for public notices.

    b. Local and regional news media in the vicinity of the proposed action.

    c. Groups or individuals which have demonstrated an interest and have requested receipt of this type of information.

    d. All participants in the scoping process not covered in subd. a. through c.

    (c) Period of time for comment on the DEIS.

    1. A minimum of 45 days from the date the DEIS is mailed shall be allowed for the receipt of comments. Depending upon the length and complexity of the DEIS, the department may establish an initial review period up to a total of 90 days. A reasonable request for extension, up to 15 days beyond the initial review period, may be granted by the department for the review of the DEIS.

    2. If the department determines that a review period of less than 45 days will suffice for the DEIS, the department may limit the review period to no less than 20 days. The DEIS, announcement sheet and public notices shall call attention to the reduced review period and shall specify the date by which comments on the DEIS must be submitted to the department if they are to be considered in developing the FEIS.

    (2) Distribution and review of the FEIS. (a) The FEIS shall be distributed in the same manner as the DEIS, and shall also be distributed to any person, organization or agency that submitted comments on the DEIS.

    (b) The availability of the FEIS shall be announced through a notice of public hearing or through an announcement sheet similar to the announcement of the availability of the DEIS.

(c)    A period of not less than 30 days and not more than 90 days from the date the FEIS is mailed, depending on the length and complexity of the FEIS, shall be allowed for receipt of comments from state and federal agencies and the public. A reasonable request for an extension, up to 15 days beyond the initial review period, may be granted by the department for the review of the FEIS.

**Adm 60.08 Public hearings on the DEIS and FEIS.**    (1) Whenever a proposed action requires a DEIS and an FEIS, the department shall hold a public hearing on the DEIS, no sooner than 30 days after its issuance, and shall also hold a public hearing on the FEIS, no sooner than 30 days after its issuance and prior to making a final decision. These hearings shall be noticed and conducted in the same manner as a contested case proceeding under ch. 227, Stats. The final draft of the EIS issued by the department, and the record of decision provided in Adm 60.09, are intended to satisfy the decision requirement of s. 227.10, Stats.

(2)    The hearings shall be held in the locality affected; on actions of statewide significance, the hearing may be held in Madison.

(3)    The department shall issue a news release to news media in the vicinity of the proposed action for each public hearing on a DEIS or FEIS. Notice shall also be mailed to all known departments and agencies required to grant any approval necessary for the proposal; to any regional planning commission within which the affected area lies; to the governing bodies of all towns, villages, cities and counties within which any part of the proposal lies; to the governing bodies of any towns, villages or cities contiguous to any town, village or city within which any part of the proposal lies; and to interested persons who have requested such notification.

Persons, organizations or agencies that attended the DEIS public hearing shall also receive notice of the FEIS public hearing.

(4)    After the FEIS public hearing provided in sub. (1), the department shall carefully review the hearing record and summarize the comments received on the DEIS and the FEIS.

**Adm 60.09 Record of decision.**    Where an EIS is prepared, the department shall also, at the time of its final decision, prepare a record of decision. The record of decision shall identify all alternatives considered in the order of their environmental preference. The record of decision shall state whether for the alternative selected, all practicable means to avoid or minimize environmental harm have been adopted, and if not, why they were not.